**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| IN RE ENGAGESMART, INC.<br>STOCKHOLDER LITIGATION | ) C.A. No. 2023-1093-JTL<br>) |

**OPINION REGARDING MOTIONS TO DISMISS**

Date Submitted: November 13, 2025
Date Decided: February 27, 2026

Ned Weinberger, Mark Richardson, Jiahui (Rose) Wang, LABATON KELLER SUCHAROW LLP, Wilmington, Delaware; Kimberly A. Evans, Lindsay K. Faccenda, Irene Lax, Daniel M. Baker, Robert Erikson, BLOCK & LEVITON LLP, Wilmington, Delaware; Guillaume Buell, John Vielandi, Joshua M. Glasser, LABATON KELLER SUCHAROW LLP, New York, New York; Jason Leviton, Nathan Abelman, BLOCK & LEVITON LLP, Boston, Massachusetts; Jeremy Friedman, David Tejtel, Christopher M. Windover, David A. Rosenfeld, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York; Douglas E. Julie, W. Scott Holleman, JULIE & HOLLEMAN LLP, New York, New York; *Attorneys for Lead Plaintiffs Genessee County Employees' Retirement System and Morabito Living Revocable Trust DTD 5/29/2015, and Additional Plaintiff Anthony Franchi.*

A. Thompson Bayliss, April M. Ferraro, Ben Lucy, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Stefan Atkinson, John P. Del Monaco, Sarah Schultes, KIRKLAND & ELLIS LLP, New York, New York; *Attorneys for Defendants EngageSmart, Inc., Vista Equity Partners Management, LLC, Vista Equity Partners Fund VIII, L.P., Vista Equity Partners Fund VIII-A, L.P., Vista Equity Partners Fund VIII GP, L.P., VEPF VIII GP, LLC, Icefall Merger Sub, Inc., and Icefall Parent, LLC.*

Daniel A. Mason, Sabrina M. Hendershot, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Andrew G. Gordon, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; Lina Dagnew, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Washington, District of Columbia; *Attorneys for Defendants General Atlantic, L.P., General Atlantic (IC), L.P., General Atlantic (IC) SPV, L.P., David Mangum, Preston McKenzie, Raph Osnoss, and Paul G. Stamas.*

Srinivas M. Raju, Matthew W. Murphy, Kevin M. Kidwell, Elizabeth J. Freud, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Defendants Robert Bennett and Deborah Dunnam.*

Joseph O. Larkin, Cliff C. Gardner, Nicole A. DiSalvo, Louis K. Tiemann, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Attorneys for Defendants Matthew Hamilton and Diego Rodriguez.*

Stephen C. Norman, Jaclyn C. Levy, Callan R. Jackson, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; David B. Hennes, Lisa H. Bebchick, ROPES & GRAY LLP, New York, New York; Mark S. Gaioni, ROPES & GRAY LLP, Los Angeles, California; Sarah M. Samaha, ROPES & GRAY LLP, Washington, District of Columbia; Phillip Z. Yao, ROPES & GRAY LLP, Boston, Massachusetts; *Attorneys for Defendant Goldman Sachs & Co. LLC.*

**LASTER, V.C.**

A private equity firm acquired a controlling interest in a software company. It secured governance rights, including director nomination rights. Half of the board comprised the controller's nominees.

Two years passed. Needing liquidity, the controller approached another private equity firm about buying part of its stake and potentially taking out the public minority.

Anticipating a proposal, the board set up a special committee. After signing an NDA and receiving due diligence, the favored buyer hesitated. The special committee went into hibernation.

Ten months later, the favored buyer returned. The board reactivated the special committee. The controller delivered an *MFW* letter and told the board it would only consider selling a minority stake.

The controller and its longtime financial advisor, now representing the company, led the bidder outreach. They told bidders that the controller would only consider selling a minority stake. The bid letter asked for proposals that included a special distribution to the controller.

The company received several first-round bids for a minority stake. The company's financial advisor then gave the favored buyer a price tip that helped shape its proposal. The company told all of the interested parties that it would entertain second-round bids.

A few weeks later, the favored buyer made a surprise control bid. It proposed to acquire 60% of the company, including the public shares. The controller would sell

part of its shares into the offer and roll over the rest. The favored buyer told the company that it would not consider purchasing a minority stake.

The controller asked the special committee if it could negotiate price and governance terms concurrently with the potential buyer. The governance terms included liquidity rights. The special committee agreed.

What emerged from those negotiations was a $4 billion take-private transaction that the special committee, the board, and the stockholders approved. The favored buyer cashed out the company's public stockholders for $23 per share and ended up owning 65% of the company. The controller sold some of its shares to the favored buyer at the same price the public received. The controller rolled over the rest in return for a 35% post-transaction stake. The controller also received $500 million in the form of an undisclosed post-closing dividend on its rolled-over shares.

This action followed. The plaintiffs represent a putative class of former public stockholders. They allege that the controller and the directors breached their fiduciary duties by negotiating and approving a transaction that was unfair to the public minority. They also claim that the fiduciaries breached their duty of disclosure. They further contend that the company's financial advisor and the favored buyer aided and abetted the sell-side breaches of duty.

Five groups of defendants briefed motions to dismiss. All claim that the transaction complied with *MFW*'s requirements, warranting dismissal. This decision rejects the defendants' pleading-stage invocation of *MFW* because the complaint alleges facts making it reasonably conceivable that the stockholder vote was not fully

informed. Entire fairness becomes the operative standard of review, and the defendants do not argue for dismissal under that standard.

Separately, the CEO, two special committee members, and another director seek dismissal on the basis of exculpation. The CEO, one special committee member, and the other director face potential liability for non-exculpated claims. One special committee member only faces care claims and is entitled to dismissal.

Finally, the complaint states a claim for aiding and abetting breaches of fiduciary duty against the company's financial advisor. The complaint fails to state an aiding and abetting claim against the favored buyer.

## I. FACTUAL BACKGROUND

The facts are drawn from the amended complaint (the "Complaint"), documents the Complaint incorporates by reference, and documents subject to judicial notice.[1] At this procedural stage, the court must credit the Complaint's well-pled allegations and draw all reasonable inferences in the plaintiffs' favor.

### A. The Company

In 2009, Robert Bennett founded InvoiceCloud (the "Company"), an electronic payments and billing processor. Bennett served as CEO.

---

[1] Citations in the form "Compl. ¶ ___" refer to paragraphs of the Complaint, which is the operative pleading. Dkt. 72. Citations in the form "Ex. ___ at ___" refer to exhibits to the transmittal affidavit of Ben Lucy, which collects documents that are incorporated by reference in the Complaint or that are subject to judicial notice. Dkt. 127. Page references cite to internal pagination whenever possible.

In 2015, private equity firm Summit Partners purchased a stake in the Company. Summit's investment gave it the right to appoint one member of the board of directors (the "Board"). Summit appointed Matthew Hamilton, one of its managing directors.

In 2018, General Atlantic, another private equity firm, acquired a controlling interest in the Company. General Atlantic has also invested in other Summit-backed companies, and the two firms have a long history of partnering on investments.

In 2020, the Company rebranded as EngageSmart. It went public in 2021 in an IPO priced at $26 per share. After the IPO, General Atlantic controlled approximately 60% of the Company's voting power. General Atlantic, Summit, and the Company executed a governance agreement that cemented General Atlantic's control (the "Governance Agreement"). The Governance Agreement authorized General Atlantic to (i) designate five of the Company's eight directors, including the Board chair; (ii) designate one member of each Board committee; (iii) remove directors by majority Board vote (!); and (iv) block most major corporate actions through granular pre-approval requirements. The Governance Agreement preserved Summit's right to nominate one director.

At the time of the challenged transaction, General Atlantic had four designees on the Board: Board chair Paul Stamas, Ralph Osnoss, David Mangum, and Preston McKenzie. Each worked at General Atlantic: Stamas was a managing director and Global Co-Head of Financial Services, Osnoss was a managing director, Mangum was a Senior Advisor, and McKenzie was an Operating Partner.

4

Consistent with the Governance Agreement, General Atlantic had a fifth director on the Board—Ashley Glover—until she resigned on November 9, 2021. After her departure, General Atlantic did not formally designate a fifth director. General Atlantic recommended Deborah Dunnam for consideration but did not formally designate Dunnam as one of its nominees under the Governance Agreement. She joined the Board in 2021. Goldman Sachs, General Atlantic's longtime financial advisor, proposed Diego Rodriguez as a director, and he joined the Board in 2022. Once again, General Atlantic did not formally designate Rodriguez as one of its designees.

At this stage of the case, it is not clear why General Atlantic proceeded in this fashion. One possibility is that General Atlantic was looking ahead to a transaction that might be challenged and liked the optics of having two directors that it had not designated.

The two remaining directors were Bennett (the Company's CEO) and Hamilton (from Summit).

## B. General Atlantic's Need For Liquidity

By early 2022, the General Atlantic funds holding its investment in the Company were nearing the end of their ten-year lifecycles. Some of the limited partners were pressing to get their capital back. General Atlantic needed liquidity.

On March 31, 2022, Stamas met with Jeff Wilson, the managing director of Vista Equity Partners ("Vista"), another private equity firm. After the meeting,

Stamas reported to Bennett that Vista wanted to start a dialog about the Company. Wilson met with Bennett in late April. No one disclosed those meetings to the Board.

Stamas and Bennett asked Goldman to present at the Board's May 3, 2022 meeting on "liquidity for shareholders."[2] During the meeting, Goldman discussed the gap between the Company's stock price and its strong financial performance. Goldman proposed several strategic alternatives but did not suggest a take-private transaction.

Meanwhile, Vista evaluated the Company and concluded that it was an "A asset" with potential for further growth that the market failed to appreciate.[3] An internal Vista presentation contemplated paying $27 per share for the public minority and for part of General Atlantic's stake. The presentation envisioned a post-transaction structure in which Vista owned 44% of the Company, co-investors owned 17.6%, and General Atlantic owned 38.4%.

During a May 31, 2022 Zoom call, Bennett told Vista that General Atlantic was open to a bid. Vista ramped up its efforts and hired Bain & Company for help. Bennett continued talking to Vista about a potential transaction without involving the Board.

On June 10, 2022, Scott Semel, the Company's General Counsel, contacted Graham Robinson, an M&A partner at Skadden, Arps, Slate, Meagher & Flom LLP, to schedule a call with directors Dunnam, Hamilton, and Rodriguez. Semel explained

---

[2] Compl. ¶ 372 (quoting GA_00009400 at 400).

[3] *Id.* ¶ 77 (quoting VISTA_00004790 at 791).

6

that the directors were prospective members of a special committee and asked Robinson to describe his experience and credentials for them. It is reasonable to infer at this stage that Semel was seeking to influence the future special committee's choice of counsel.

## C.     A Short-Lived Engagement

On June 27, 2022, the Board discussed a potential transaction involving Vista for the first time. Robinson attended as counsel to the yet-to-be-formed special committee. The Board resolved to form a special committee comprised of Dunnam, Hamilton, and Rodriguez (the "Committee"). The Board determined that Dunnam, Hamilton, and Rodriguez were "independent from General Atlantic and not otherwise interested."[4] The minutes do not explain the basis for those determinations.

The next day, Vista and the Company entered into a non-disclosure agreement, and the Company granted Vista access to due diligence materials. Bennett and Cassandra Hudson, the Company's CFO, met with Vista that evening.

The following morning, Vista met with a broader swathe of Company management. Vista described its "Partnership Philosophy" that included "[a]ccelerating growth and driving value through close partnership with our executives."[5]

---

[4] *Id*. ¶ 95 (quoting EngageSmart_0000046614 at 615).

[5] *Id*. ¶ 105 (quoting VISTA_00004286; VISTA_00004287 at 294).

Meanwhile, the Committee looked for a financial advisor. They ruled out Goldman as "conflicted."[6] Hamilton told a Summit colleague that when selecting an advisor, he was "trying to curry favor with some places that tend to show [Summit] more deal flow."[7]

On July 21, 2022, the Vista deal team presented internally to Vista's investment committee. The team proposed to buy a 55.6% stake in the Company for $26 per share. General Atlantic would receive cash for 37% of its stake and roll over the other 63%, ending up with 44.4% of the post-transaction entity. The investment committee liked the deal but deferred proceeding because of macroeconomic conditions.

On July 27, 2022, Vista told Bennett they were standing down. Vista suggested, however, that they "plan[ned] to come back to [the Company] in the coming months with a specific proposal on valuation."[8]

With no transaction imminent, the Committee suspended its work.

---

[6] *Id.* ¶ 109 (quoting SC-00000823 at 824).

[7] *Id.* ¶ 110 (quoting SC-00000823 at 824).

[8] *Id.* ¶ 121 (quoting GA_00009162 at 162).

**D.    General Atlantic And Goldman Consider Strategic Alternatives.**

After Visa withdrew, General Atlantic told Goldman that it felt "paralyzed" in its efforts to monetize its stake in the Company.[9] General Atlantic and Goldman brainstormed alternatives to generate liquidity.

One alternative was a secondary offering. On March 1, 2023, the Company announced a secondary offering of eight million shares owned by General Atlantic, Summit, and some members of management. The offering was priced at $19 per share—below the prior day's closing price of $21.04.

The secondary offering was not enough to address General Atlantic's liquidity needs. General Atlantic continued to explore alternatives, including a potential leveraged buy-out to cash out some of its stake.

**E.    Vista Returns.**

In May 2023, Vista re-engaged. The deal team consulted Kirkland & Ellis for legal advice and Ernst & Young for tax advice. Vista anticipated "taking another run at this name this summer."[10] The transaction model envisioned Vista paying $23 per share to the public and for some of General Atlantic's stake, but with General Atlantic rolling over enough shares to own 50% of the post-transaction entity. Vista also modeled a transaction at $25 per share.

---

[9] *Id*. ¶ 124 (quoting GS_00028479 at 479).

[10] *Id*. ¶ 170 (quoting VISTA_00008680 at 680–81).

During the week of June 12, 2023, Stamas golfed and dined with Vista executive Michael Fosnaugh in Nantucket. They agreed to "stay[] in touch" and "compar[e] notes on what we're seeing / things in our portfolio."[11] Fosnaugh forwarded the email exchange to his Vista colleagues as an "Fyi if this connection can ever be useful for EngageSmart."[12]

## F. General Atlantic And Goldman Continue Strategizing.

On June 20, 2023, the banker that had let the secondary offering advised General Atlantic that investors remained focused on its "monetization plans."[13] That same day, General Atlantic asked Goldman "to run take private math for EngageSmart" and scheduled a kickoff call for June 27.[14]

During the call, the group discussed two structures. In one, a buyer would acquire control with "GA expect[ing] a big premium."[15] In the other, General Atlantic would roll over its full stake and return control and would not receive a control premium, but the Company would sell off businesses to generate liquidity.[16] General Atlantic preferred the latter option.

---

[11] *Id.* ¶ 131 (quoting VISTA_00009604 at 605).

[12] *Id.* ¶ 132 (quoting VISTA_00009604 at 604).

[13] *Id.* ¶ 133 (quoting GA_00003158 at 158–59).

[14] *Id.* ¶ 136 (quoting GS_00049060 at 062).

[15] *Id.* ¶ 137 (quoting GS_00065857).

[16] *Id.* (quoting GS_00065857).

The group also discussed the likelihood of litigation for "a related party [transaction]."[17] They noted that "[a]ll the books and documents that get made become public" and resolved to be conscious of "[w]hat should be talked about / written down, given the complexity of potential transaction."[18]

On July 12, 2023, the group had a follow-up call. Goldman presented a "Take Private Through Minority Sale."[19] A draft of the presentation cited as benefits the "[p]otential for GA to monetize some stake" while "[a]llow[ing] GA to maximize future upside and drive strategic vision."[20] General Atlantic's counsel at Paul Weiss rewrote those bullet points to reference "[n]ear term liquidity for minority shareholders."[21] Goldman questioned whether a minority sale was actionable. One banker wrote, "[N]obody wants to write [a] big check and be in a minority position."[22]

The Goldman materials also discussed a potential "Take Private Through Majority Sale."[23] A draft of the presentation cited as benefits "[a]llow[ing] GA a near-

---

[17] *Id.* ¶ 138 (quoting GS_00065857).

[18] *Id.* (quoting GS_00065857).

[19] *Id.* ¶ 148 (quoting GS_00066149 at 150).

[20] *Id.* (quoting GS_00066149 at 150).

[21] *Id.* ¶ 150 (quoting GS_00066301).

[22] *Id.* ¶ 147 (quoting GS_00066316 at 316).

[23] *Id.* ¶ 151 (quoting GS_00066301).

11

term liquidity event with ability to participate in future upside."[24] Paul Weiss struck that bullet point from the presentation.

The Goldman materials also included an "Illustrative LBO Analysis."[25] Goldman modeled a takeout price of $23 per share.

That same day, a Goldman partner described the potential deal timeline: "We propose a deal and a price, we haggle with the committee, likely bump our price then we shake hands and then do the confirmatory diligence."[26] The Goldman partner noted that "[t]he ideal" would be to "present a fully baked deal with price agreed between us and partner to board."[27]

## G. Goldman Realigns.

On July 14, 2023, General Atlantic and Goldman held a "Sync" call.[28] After the call, Stamas spoke with Paul Weiss, inferably about whether Goldman could switch from helping General Atlantic to working as the Company's financial advisor. According to Stamas, the Paul Weiss attorney's "instinct was that it was workable, but he also wanted to reflect and discuss with a colleague."[29]

---

[24] *Id.* (quoting GS_00066301).

[25] *Id.* ¶ 161 (quoting GS_00066585 at 591).

[26] *Id.* ¶ 155 (quoting GS_00066762 at 762).

[27] *Id.* ¶ 158 (quoting GS_00066762 at 762).

[28] *Id.* ¶ 162 (quoting GS_00030381).

[29] *Id.* ¶ 163 (quoting GA_00010274 at 276).

On July 17, 2023, the Paul Weiss attorney reported that he was "having one more convo."[30] General Atlantic, Goldman, and Paul Weiss followed up with a call.

Later that day, the Goldman bankers sought internal approval "to advise EngageSmart on a minority sale / take-private transaction" but noted that they "ha[dn't] spoken to the company on this yet."[31] Goldman's in-house counsel was concerned. The in-house lawyer wanted to ensure that "the special committee with advice from Skadden really agree and be comfortable with the company hiring us to do this."[32] In-house counsel also wanted to ensure that the committee would be "in the loop and get to sign off on or veto the things we do."[33]

## H.  The Committee Reactivates.

On July 20, 2023, the Board revived the Committee with the same membership. Skadden reengaged as Committee counsel, with Robinson again leading the engagement.

On July 21, 2023, Robinson told the Committee that General Atlantic was considering selling a portion of its stake, but that the block would only constitute a minority position in the Company. He reported that General Atlantic was "not willing

---

[30] *Id.* ¶ 164 (quoting GA_00010274 at 276).

[31] *Id.* ¶ 165 (quoting GS_00030624).

[32] *Id.* ¶ 168 (quoting GS_00067070 at 070).

[33] *Id.* (quoting GS_00067070 at 070).

13

to solicit whole company acquisition proposals," but acknowledged that General Atlantic "might be receptive" if any proposal materialized.[34]

Robinson also informed the Committee that the Company intended to hire Goldman as its financial advisor. Robinson reported that Goldman was "not expected to be an advisor to the Special Committee given its long-standing relationship with the Company and its controlling shareholder, [General Atlantic]."[35] Robinson informed the Committee that Goldman would be reaching out to private equity firms about purchasing a minority stake.

On July 23, 2023, Dunnam withdrew from the Committee because of a connection to General Atlantic. That left Hamilton and Rodriguez as the Committee's members.

The Committee signed off on the Company retaining Goldman. The Board and Committee meeting minutes do not reflect any discussion of Goldman's history representing General Atlantic or other potential conflicts.

The Committee retained Evercore as its financial advisor. Evercore disclosed receiving $41 million in fees from General Atlantic over the past five years. Evercore did not disclose its relationships with Summit or Vista. After the Committee hired Evercore, the firm disclosed that it had received $36 million from Summit over the past five years and $18.5 million from Vista from January 2020 to October 2023. An

---

[34] *Id*. ¶ 177 (quoting SC-00000107 at 108).

[35] *Id*. ¶ 178 (quoting SC-00000107 at 109).

14

Evercore Senior Managing Director disclosed that he was personally "involved in a live engagement currently with Summit with fee tbd."[36]

The engagement letters for both Goldman and Evercore made their compensation contingent on completing a transaction. Evercore had initially requested that its engagement letter provide for a fee payment if the Company remained a standalone entity and decided to spin-off a subsidiary, but the Committee declined. According to the Complaint, after the Committee's refusal, Evercore backed off its initial assessment that a subsidiary spin-off could be more favorable for the Company's public stockholders than General Atlantic's proposed structure.

The Committee authorized the Company to work with General Atlantic and Goldman to conduct outreach to potential buyers. Around this time, although the exact timing is unclear, Stamas asked the Committee to authorize General Atlantic to provide confidential information to potential investors about how "GA remaining a controlling shareholder could enable future tax efficient spinoff structures for a separation of the Company's business."[37] Stamas argued that providing the information "could cause new sponsors to increase the valuation of their investment."[38] The Committee agreed.

---

[36] *Id.* ¶ 190 (quoting EVR_0000929 at 930).

[37] *Id.* ¶ 179 (quoting EngageSmart_0000046627 at 628).

[38] *Id.* (quoting SC-00000107 at 108).

15

The Committee decided not to explore interest in a whole company sale or other transactions that General Atlantic had not agreed to support, like a sale of a majority stake in the Company. Goldman's outreach script stated the Company and General Atlantic were only soliciting interest in a minority stake.

On July 31, 2023, General Atlantic delivered a letter to the Board that conditioned any transaction on independent special committee approval and a majority-of-the-minority vote.

## I. Plans For Bidder Outreach

On August 6, 2023, Evercore, Skadden, and Goldman held a kickoff call to discuss the plan and timeline for bidder outreach. Evercore criticized the plan to only solicit interest in a minority sale. Evercore believed the process should incorporate the possibility of a whole company sale and that after receiving expressions of interest, everyone should "step back and analyze strategic alternatives before moving too far down any path."[39]

Evercore made similar points in a presentation to the Committee. Evercore prioritized "[e]nsuring Special Committee and Advisors can properly evaluate standalone value versus strategic alternatives before any process progresses past a preliminary phase."[40] Evercore prioritized "[m]aintaining optionality," including for

---

[39] *Id*. ¶ 211 (quoting EVR_0020683 at 693).

[40] *Id*. ¶ 214 (quoting EVR_0059008 at 010).

16

a "potential WholeCo or other value-maximizing transaction."[41] Evercore advised that in light of those considerations, the "GS outreach plan and forward calendar" had to be "[r]efin[ed]."[42] Evercore proposed that the outreach script say the Board was "open to all value-creating alternatives," including a sale of the whole Company.[43]

Before approving any edits, the Committee sought "feedback from GA."[44] General Atlantic vetoed Evercore's proposed language and replaced it with a statement that "[t]he deal we are considering right now is as discussed above [i.e., a minority deal only]."[45] Evercore reiterated that "[w]e should not decisively rule out a Change of Control transaction at this point."[46] On behalf of the Committee, Hamilton rejected Evercore's advice and signed off on General Atlantic's version.

Evercore also advised the Committee to consider strategic buyers, who had a "potentially higher ability to pay given synergy potential."[47] The Committee, however, resolved not to reach out to strategic partners because "GA was expected to

---

[41] *Id.* (quoting EVR_0059008 at 010).

[42] *Id.* (quoting EVR_0059008 at 010).

[43] *Id.* ¶ 212 (quoting GS_00068846 at 847).

[44] *Id.* ¶ 222 (quoting SC-00000128 at 129).

[45] *Id.* ¶ 224 (quoting GS_00069317 at 317).

[46] *Id.* ¶ 225 (quoting EVR_0020944).

[47] *Id.* ¶ 220 (quoting EVR_0059201 at 242).

17

request prioritized outreach to the investors it viewed as more likely to be interested in a [minority stake]."[48]

Evercore therefore provided the Committee with a list of prospective financial buyers broken down into three tiers: 1, 1A, and 2. Vista fell into tier 1A. Evercore did not include Visa in tier 1 because Vista was expected to want to acquire control, and General Atlantic ostensibly would not consider that.

The bankers only called the tier 1 buyers. They did not contact Vista.

## J.  Bennett Tips Vista.

Unlike General Atlantic and the bankers, Bennett wanted a change-in-control transaction. He hoped to retire, and a change-in-control transaction would cause all of his unvested options to vest and become exercisable. He also stood to gain roughly $11 million in severance if he was terminated or resigned for good reason after a change of control.

Bennett knew that Vista was interested in a control deal. On August 8, 2023, without the Committee's knowledge or permission, Bennett emailed Vista's Wilson. They agreed to meet on September 5.

After Bennett's outreach, Vista spoke with General Atlantic on August 21, 2023. Vista said it had continued to follow the Company and remained interested in a transaction.

---

[48] *Id*. ¶ 221 (quoting SC-00000128 at 129).

On September 5, 2023, Bennett and Wilson met in San Francisco. Wilson relayed Vista's positive views about the Company. Bennett told Wilson that he wanted to retire after a transaction.

Bennett told Goldman about the meeting. No one told the Committee.

## K. The Sale Process

General Atlantic wanted to complete a transaction before the Company's next earnings announcement in November 2023. Goldman followed General Atlantic's instructions and scheduled meetings with potential buyers for August. A sale process that proceeded at that pace would limit the Committee's time to evaluate other alternatives—just what Evercore had warned the Committee about.

### 1. Goldman Tries To Exclude Evercore.

Goldman's cutthroat instincts soon impaired the Committee's ability to oversee the sale process. The NDA for potential acquirers required all bidder communications to go through both Goldman and Evercore. Goldman, however, sought to exclude Evercore at every turn. Goldman repeatedly failed to share bidder correspondence with Evercore. One lead Evercore banker wondered "how come GS in receipt of bidder questions without sharing with us," when "[t]he nda clearly states no interaction but through advisors."[49] Evercore asked to attend meetings with bidders, but Goldman refused.

---

[49] *Id*. ¶ 242 (quoting EVR_0021620 at 621).

Goldman does not appear to have had any valid process-related reason for excluding Evercore. The internal Goldman emails ooze self-importance, dismissing Evercore as "delusional" to regard the firms as "basically co-advisors."[50] When Evercore provided comments, Goldman bankers derided them "useless" and saw "no need" for them.[51]

In fact, Evercore played a critical role by acting as the Committee's eyes and ears. Goldman let pettiness undermine the process.

### 2. Vista Receives Special Treatment.

On September 19, 2023, Goldman told Evercore that Vista had contacted General Atlantic. Goldman reported that General Atlantic was "thinking of letting them in the process."[52] Goldman rejected two other potential acquirers out of hand, saying only "they will not be appropriate partners at this juncture."[53] The Committee learned of the decisions after the fact.

Vista immediately received special treatment. Vista asked to work with Bain, and the Committee agreed as long as Vista signed a new confidentiality agreement. Other bidders were not allowed to work with consultants. Vista also asked to use its

---

[50] *Id*. ¶ 243 (quoting GS_00092810 at 816–17).

[51] *Id*. (quoting GS_00092810 at 816–18).

[52] *Id*. ¶ 249 (quoting EVR_0008224 at 224–25).

[53] *Id*. (quoting EVR_0008224 at 225).

files from its engagement with the Company in 2022. The Committee agreed, giving Vista access to information that other bidders did not have.

### 3. Evercore Tries Again To Open Up The Process.

With Vista in the process and expected to make a control bid, Evercore again recommended that the Committee consider transaction structures other than a minority sale. Evercore noted that "[a] control sale of the Company offers the potential to realize a premium to the current share price."[54] Evercore also advised a control sale would appeal to financial sponsors and that excluding that option was limiting "the depth of buyer demand."[55]

When the time came to draft instruction for first-round bids, Evercore proposed modifying the process letter to include an option for bidders to propose a different transaction structure. Goldman, General Atlantic, and Paul Weiss struck the edit. Evercore explained to the Committee that including its alternative would generate information about what bidders would pay for control. The Committee approved the version that omitted Evercore's proposal.

On September 26, 2023, Goldman sent the letter to potential bidders. It established a deadline of October 5 for preliminary indications of interest. The letter only solicited interest in up to 49% of the Company's shares.

---

[54] *Id*. ¶ 255 (quoting EVR_0048450 at 452).

[55] *Id*. ¶ 256 (quoting EVR_0048450 at 452).

21

The bid process letter openly contemplated special consideration for General Atlantic by asking bidders to "indicate the amount of funds you assume is used for a distribution of proceeds to the non-selling shareholder."[56] The letter reminded bidders that their confidentiality agreements prohibited them from speaking with financing sources without Goldman's express permission.

**L.     Goldman Tips Vista.**

On October 5, 2023, *Reuters* reported that General Atlantic was exploring a sale of the Company. Eight potential buyers reached out to Goldman and Evercore. Evercore's lead banker thought the inbound calls should open the process to more interested parties and deal structures. Later that day, four of the initial bidders (Advent, Francisco Partners, Hg Capital, and TCV) submitted first-round proposals. All proposed to acquire minority stakes for up to $22.00 per share. Vista missed the deadline.

The next morning, Evercore tried to coordinate with Goldman on follow-up calls. Goldman brushed off the idea, saying they should "wait until we get Vista before talking to these parties."[57]

---

[56] *Id*. ¶ 368 (quoting SA-ESMT0009274 at 275).

[57] *Id*. ¶ 280 (quoting EVR_0011147).

On October 7, 2023, Goldman suggested to Vista that "any bid in this round" should be "above $22.00."[58] That tip set a floor for Vista's first-round bid. Internally, the Vista team members discussed their preference for a control bid.[59]

On October 9, 2023, Vista proposed to buy 49% of the equity in a range of $22.00 to $23.00 per share. Vista separately emphasized to Goldman that it "[w]ant[ed] to get [a] deal done quickly" and would be conducting "business diligence over next week."[60] Days earlier, Evercore's bankers had speculated internally about whether Vista would pursue "the playbook they often do," which involves sprinting ahead of other bidders thanks to an early informational advantage, then pressuring the target with an exploding offer.[61]

The Committee met the next day. The members decided to invite Vista, Hg Capital, and Francisco Partners to make second-round bids and allow Thoma Bravo (who did not submit an initial offer) to continue due diligence and seek potential equity financing. The Committee declined to invite bids from any of the parties who expressed interest after the *Reuters* article.

---

[58] *Id.* ¶ 281 (quoting Ex. D at 43; citing GS_00052160).

[59] *Id.* ¶ 283 (Vista representatives discussing that they "likely won't be able to get comfortable with the lack of operational control" from holding a minority position (quoting VISTA_00021227 at 227)).

[60] *Id.* ¶ 287 (quoting GS_00052160 at 160).

[61] *Id.* ¶ 268 (quoting EVR_0009923 at 923).

The Committee told Hg Capital, Francisco Partners, and Thoma Bravo that the final bid date was roughly four weeks away. The Committee told Vista that "if it wished to complete its due diligence more quickly" then "the Company would be willing to support Vista's efforts."[62] Internally, Vista was already modeling a transaction in which it would acquire 70% of the post-transaction entity.

## M. Vista's "Curveball" Control Bid

On October 13, 2023, Vista asked Goldman to arrange a meeting with Bennett and Hudson (the Company's CFO) on October 18. The Committee approved the meeting on two conditions. First, someone from Evercore had to attend. Second, Vista could not discuss the transaction terms or post-closing compensation or roles.

During the dinner, Hudson asked Vista for its "thoughts on leverage," violating the Committee's instruction not to discuss deal terms.[63] Although Evercore attended, Goldman continued to sideline the firm. Goldman failed to respond to Evercore's emails and denied Evercore access to specific folders in the virtual data room. That was more pettiness that undermined the process.

On Friday, October 20, 2023, Vista's investment committee authorized the deal team to bid up to $24 per share for a 70% interest in the Company. Vista's model contemplated a price range of $22 to $26 per share.

---

[62] *Id*. ¶ 297 (quoting SC-00000121 at 122).

[63] *Id*. ¶ 313 (quoting EVR_0014276 at 277).

24

During a call that afternoon with General Atlantic, Goldman, and Evercore, Vista communicated that it was "not interested in a deal in which GA retains control" and would "not participate in the process if that is the only structure GA wishes to pursue."[64] Vista then proposed to acquire 60% of the Company at $22.75 per share. General Atlantic would roll over a portion of its existing shares and receive 40% of the post-closing equity. Vista's offer letter expressed a need for "Speed & Certainty" and a desire to engage "on a very expedited timeline."[65] Otherwise, Vista would "be forced to reevaluate."[66]

Fast meant really fast. Vista proposed announcing the transaction "by market open on Monday."[67] The General Atlantic and Company representatives told Vista that "it was a lot to digest and certainly a curveball."[68]

Stamas immediately sent the "curveball" offer to Goldman and Paul Weiss. Goldman told Evercore that General Atlantic was potentially willing to consider a control deal with Vista.

Evercore reported to the Committee at a 3:50 p.m. meeting. The Committee expressed concern that Vista would "disengage" if the Company spent time

---

[64] *Id*. ¶ 320 (quoting EngageSmart_0000037875 at 876–77).

[65] *Id*. ¶ 322 (emphasis omitted) (quoting GS_00089248 at 249).

[66] *Id*. (emphasis omitted) (quoting GS_00089248 at 249).

[67] *Id*. ¶ 320 (quoting EngageSmart_0000037875 at 876–77).

[68] *Id*. ¶ 324 (quoting VISTA_00037119).

25

negotiating with other potential bidders over a control transaction, even though Francisco Partners previously expressed a preference for a control deal.[69] The Committee also discussed whether Vista might buy all of the Company's equity without any General Atlantic rollover, but the Committee never proposed asking Vista if it would pay more to acquire 100% of the Company. The Committee also did not consider including new bidders or different transaction structures.

Instead, the Committee focused on Vista. The Committee prioritized "seeking to maximize the per share price that Vista would pay . . . while limiting the risk that General Atlantic would request changes to governance or other terms proposed by Vista that would impact the per share price."[70]

The Committee met again at 6 p.m. Evercore reported that General Atlantic was evaluating the governance structure of the post-closing company. Evercore warned that General Atlantic's governance demands could affect the price.

The Committee directed Evercore to counter at $24 per share with a 45-day go-shop, no expense reimbursement if stockholders did not approve the deal, and full acceleration and payment in cash for equity awards. Before countering, the Committee asked General Atlantic for input. General Atlantic told the Committee it would support the counteroffer if General Atlantic could concurrently negotiate governance terms with Vista.

---

[69] *Id.* ¶ 328 (quoting SC-00000131 at 132; Ex. D at 47–48).

[70] *Id.* ¶ 331 (quoting SC-00000131 at 132–33).

The governance terms included the number of directors General Atlantic could appoint, veto rights over specified transactions, transfer restrictions and sale rights, and a right to restructure the Company's mix of debt and equity. The Committee agreed that those terms could affect the price Vista would pay but decided to let General Atlantic negotiate concurrently anyway.

Evercore emailed the Committee's counterproposal to Vista that evening. General Atlantic's negotiations with Vista were already in full swing.

On Saturday, October 21, 2023, Vista increased its offer to $23 per share in cash and agreed on expense reimbursement. Vista rejected the go-shop mechanism and the acceleration and cash out of equity awards.

General Atlantic wanted to counter at $23.50 per share and propose one year of vesting credit for all equity awards. The Committee adopted that proposal and added a 30-day go-shop provision. The Committee again permitted General Atlantic to negotiate governance terms on its own. In those negotiations with Vista, General Atlantic introduced the concept of the Company taking on debt to support an additional payout to General Atlantic.

On Sunday, October 22, 2023, Vista held firm on its $23.00 per-share price. Vista also rejected vesting credit. Vista agreed to a 30-day go-shop.

The Committee asked for General Atlantic's "blessing" and waited for General Atlantic "to say ok to price."[71] Stamas thought Vista might pay another quarter or

---

[71] *Id*. ¶ 345 (quoting GA_00013002 at 007–08).

fifty cents, but felt it was "[d]umb" to put the deal at risk for that small an increase.[72]

That decision also benefited General Atlantic because its models showed that a fifty cent increase would lead to Vista demanding more equity in the rollover. That would cause General Atlantic to receive less cash in the deal. Goldman recommended against asking Vista for another price increase.

General Atlantic decided to accept Vista's price if Bennett signed off. He did. General Atlantic also wanted to sell more shares in the offer and end up with a 35% stake rather than 40%.

With General Atlantic on board, the Committee told its advisors to finalize the terms. Just before 5 p.m., General Atlantic's counsel sent a draft governance term sheet to Vista's counsel. The term sheet lowered the equity rollover to 35%. Vista accepted it.

## N.    The Recapitalization

On October 23, 2023, the Board unanimously approved the transaction (the "Recapitalization"). The headline value of the deal was $4 billion. The Company's public stockholders would receive $23 per share. General Atlantic would receive $23 per share for a portion of its shares and roll over the balance for a 35% stake in the post-transaction entity. Vista would end up with a 65% stake.

Vista only provided part of the funding from its own balance sheet. The Company provided the rest by taking on debt. How much equity General Atlantic

---

[72] *Id.* ¶ 351 (quoting GA_00013002 at 010).

rolled over would depend on how much debt the Company could borrow. As the Company borrowed more debt, the equity value of its post-transaction shares decreased. That meant General Atlantic could use fewer pre-transaction shares to warrant its 35% stock, sell more shares into Vista's offer, and receive a greater amount of cash. The smaller the equity rollover, the more liquidity General Atlantic would receive.

When the parties agreed on terms, the exact amount of debt had not been finalized. The Complaint uses the parties' estimates, made at the time of the signing, as to what the post-transaction debt would be.[73] The parties estimated that General Atlantic could sell 74% of its pre-closing equity into the offer and roll over the remaining 26% in exchange for 35% of the post-closing equity. That level of debt would also support a dividend of $500 million for General Atlantic.

The Recapitalization thus provided the public stockholders and General Atlantic with different consideration. The public stockholders received $23 per share. General Atlantic received three forms of consideration. The first was the same $23 per share that the public stockholders received. The second was the 35% equity stake in the post-transaction entity. The third was the $500 million dividend.

The amount of debt that the Company took on affected all three components. It also required negotiating with Vista, because Vista would own a 65% stake in an entity burdened with the debt. Internally, General Atlantic recognized the

---

[73] *Id*. ¶ 367 & n.700.

implications of the debt negotiation. An investment committee presentation dated October 22, 2023, reflected that General Atlantic expected "to receive liquidity at close totaling ~$1,022M, via both the incremental debt raised at the company and our sell down of equity shares."[74] That same presentation calculated that approximately $500 million of the liquidity would come from "proceeds from the debt financing."[75] General Atlantic's internal deal announcement likewise highlighted that the Recapitalization would generate "~$850M - $1Bn of liquidity as a result of both our partial equity sell down and receipt of proceeds from the debt financing."[76]

After the announcement of the Recapitalization, the Company conducted the go-shop. A higher offer did not emerge. When Francisco Partners heard about the deal, they were "[d]isappointed that the deal turned into majority" and "[w]ished they were told."[77] They saw the deal as a product of "the vista playbook."[78] Hg Capital asked Goldman "how this ended up majority" and expressed disappointment that the Company "tapped out."[79] Overbidding during a go-shop is not the same as

---

[74] *Id.* ¶ 387 (quoting GA_00012822 at 825).

[75] *Id.* ¶ 388 (quoting GA_00003546).

[76] *Id.* (quoting GA_00003546).

[77] *Id.* ¶ 356 (quoting EVR_0027932 at 934).

[78] *Id.* (quoting EVR_0027932 at 934).

[79] *Id.* (quoting EVR_0028178 at 178).

participating during a pre-signing sale process. Real competitive pressure during the pre-signing phase could have generated a superior outcome.

## O.   The Recapitalization Closes.

On December 19, 2023, the Company issued the definitive proxy soliciting stockholder support for the Recapitalization (the "Proxy Statement"). Vista and General Atlantic also made disclosures to stockholders through filings on Schedule 13E-3.

The stockholders approved the Recapitalization on January 23, 2024. The Recapitalization closed soon after.

Goldman received $36 million and Evercore received $24 million in contingent fee compensation. After the parties had agreed on terms, Hamilton told a Summit colleague who was "chasing" an Evercore-advised target that he delivered "$25M to EVR for a short sprint."[80] Hamilton added, "I hope you use that to win your deal."[81]

## P.   This Litigation

Anthony Franchi filed this class action lawsuit on October 27, 2023. Genesee County Employees' Retirement System and Morabito Living Revocable Trust DTD 5/29/2015 took over as co-lead plaintiffs.

The operative complaint spans 217 pages and contains 488 paragraphs. It contains seven counts.

---

[80] *Id.* ¶ 192 (quoting SC-00006113 at 113–14).

[81] *Id.* (quoting SC-00006113 at 113–14).

In Count I, the plaintiffs assert a breach of contract claim against the Company and eight individual directors: Bennett, Stamas, Osnoss, Mangum, McKenzie, Hamilton, Dunnam, and Rodriguez (the "Director Defendants"). Count I maintains that the Company and the Director Defendants breached Section 4(b) of the Company's certificate of incorporation, which requires all shares of common stock to have "the same powers, rights and privileges and shall rank equally, share ratably and be identical" (the "Equal Terms Provision").[82] Count I claims the Recapitalization violated the Equal Terms Provision because General Atlantic received a non-ratable benefit in the form of the equity rollover.

In Count II, the plaintiffs assert a claim for tortious interference with contract against General Atlantic[83] and Vista.[84] Count II claims the defendants tortiously interfered with the plaintiffs' rights under the Equal Terms Provision.

In Count III, the plaintiffs assert a claim for breach of fiduciary duty against General Atlantic. In Count IV, the plaintiffs assert a claim for breach of fiduciary duty against the Director Defendants. In Count VI, the plaintiffs assert a claim for breach of fiduciary duty against Bennett in his capacity as an officer. Each count contends that the fiduciaries breached their duties by engaging in the

---

[82] Ex. A, art. IV, § 4(b).

[83] The named defendants are General Atlantic, L.P. and the two General Atlantic entities that are rollover stockholders in the post-transaction entity.

[84] The named defendants are Vista Equity Partners Management, LLC and various affiliated funds and entities.

32

Recapitalization and by causing the Company to issue false and misleading disclosures to stockholders.

Counts V and VII assert claims for aiding and abetting breaches of fiduciary duty. Count V asserts that claim against Vista. Count VII asserts that claim against Goldman.

On November 12, 2025, the court dismissed Count I, any remaining aspects of Count II not previously dismissed by stipulation, and Count IV to the extent the claimed breach of fiduciary duty related to a failure to comply with the Equal Terms Provision.[85] This decision addresses the remaining claims.

## II.    LEGAL ANALYSIS

A motion to dismiss under Rule 12(b)(6) tests whether the complaint's allegations state a claim on which relief can be granted. When considering a Rule 12(b)(6) motion, "a trial court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim, [and] draw all reasonable inferences in favor of the plaintiff."[86] The court should "deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of

---

[85] Dkt. 185.

[86] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

33

proof."[87] Delaware's "governing 'conceivability' standard is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'"[88]

Three issues predominate across the remaining counts. The first is the standard of review. The defendants argue that they properly implemented the *MFW* framework such that an irrebuttable version of the business judgment rule applies and requires dismissal. This decision holds that entire fairness applies, so the claims survive.

Second, this decision analyzes whether Rodriguez, Dunnam, Hamilton, and Bennett are entitled to exculpation. The plaintiffs fail to plead any non-exculpated claims against Rodriguez, so he is dismissed on this basis. Dunnam, Hamilton, and Bennett cannot rely on exculpation at the pleading stage.

Third, this decision analyzes the aiding and abetting claims. The claim against Goldman survives. The claim against Vista does not.

## A.     The Standard Of Review

Analysis starts with the standard of review. The defendants argue that they properly implemented the *MFW* framework.[89] If so, then a version of the business

---

[87] *Id.*

[88] *Id.* at 537 n.13.

[89] *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

34

judgment rule applies under which the only remaining claim is waste.[90] That exception is more theoretical than real, because to state a claim for waste, the terms of the transaction must be so extreme "that no rational person acting in good faith could have thought the [transaction] was fair to the minority."[91] "At that point in the analysis, two groups of rational people—the committee and the minority stockholders—would have approved the transaction."[92] It is "logically difficult to conceptualize how a plaintiff can ultimately prove a waste or gift claim in the face of a decision by fully informed, uncoerced, independent stockholders to ratify the transaction."[93] The resulting version of the business judgment rule is thus rightfully described as "irrebuttable."[94]

Here, the plaintiffs did not attempt to state a claim of waste, so if *MFW* applies, then the motions to dismiss must be granted. If, by contrast, *MFW* fails, then the standard of review becomes entire fairness. The defendants do not contend that the Complaint fails to state a claim under that standard, so the motions to dismiss would

---

[90] *See In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. Oct. 10, 2016), *aff'd*, 164 A.3d 56 (Del. 2017) (TABLE).

[91] *In re MFW S'holders Litig.*, 67 A.3d 496, 500 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

[92] *In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *14 (Del. Ch. June 11, 2020).

[93] *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 901 (Del. Ch. 1999).

[94] *Cf. In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 738 (Del. Ch. 2016), *aff'd*, 156 A.3d 697 (Del. 2017) (TABLE).

be denied. At that point, the analysis would proceed to whether Rodriguez, Dunnam, Hamilton, and Bennett are entitled to dismissal on the basis of exculpation.[95]

## 1. The *MFW* Framework

To satisfy *MFW*, "the controller [must] irrevocably and publicly disable[ ] itself from using its control to dictate the outcome of the negotiations and the shareholder vote."[96] The Delaware Supreme Court has articulated six necessary and sufficient conditions for achieving that outcome:

> (i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders;
>
> (ii) the Special Committee is independent;
>
> (iii) the Special Committee is empowered to freely select its own advisors and to say no definitively;
>
> (iv) the Special Committee meets its duty of care in negotiating a fair price;
>
> (v) the vote of the minority is informed; and
>
> (vi) there is no coercion of the minority.[97]

---

[95] *See In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1179–80 (Del. 2015).

[96] *MFW*, 88 A.3d at 644.

[97] *Id.* at 645 (formatting altered).

Whether a transaction complies with *MFW* can be adjudicated at the pleading stage.[98] The plaintiff can avoid dismissal by pleading "a reasonably conceivable set of facts showing that any or all of those enumerated conditions did not exist."[99]

The plaintiffs argue that the defendants failed to comply with five *MFW* conditions. They do not assert that the minority stockholders were coerced.

This decision only considers whether the minority stockholder vote was fully informed. The plaintiffs have stated reasonably conceivable claims for breach of the duty of disclosure. *MFW* does not apply, and this decision need not reach the other requirements.

### 2. Whether The Stockholder Vote Was Fully Informed

*MFW* requires a fully informed majority-of-the-minority vote.[100] To satisfy that condition, the Company's disclosures must have "apprised stockholders of all material information" and "not materially mislead them."[101] To defeat that requirement at the pleading stage, the Complaint must support "a rational inference that material facts

---

[98] *See In re Synutra Int'l, Inc. S'holder Litig.*, 2018 WL 705702, at *2 (Del. Ch. Feb. 2, 2018), *aff'd sub nom. Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018).

[99] *MFW*, 88 A.3d at 645; *accord Olenik v. Lodzinski*, 208 A.3d 704, 715 (Del. 2019).

[100] *MFW*, 88 A.3d at 645.

[101] *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018).

were not disclosed or that the disclosed information was otherwise materially misleading."[102]

Under Delaware law, a fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[103] The test does not require "a substantial likelihood that [the] disclosure . . . would have caused the reasonable investor to change his vote."[104] Instead, the question is whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[105] The question of materiality is "a context-specific inquiry, and '[t]he myriad of detailed information that must be furnished to shareholders necessarily differs from merger to merger.'"[106]

"Delaware disclosure law also proscribes misleading partial disclosures."[107] "When fiduciaries undertake to describe events, they must do so in a balanced and

---

[102] *Id.*

[103] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[104] *Id.* (quoting *TSC Indus.*, 426 U.S. at 449).

[105] *Id.* (quoting *TSC Indus.*, 426 U.S. at 449).

[106] *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *11 (Del. Ch. June 30, 2014) (quoting *Glassman v. Wometco Cable TV, Inc.*, 1989 WL 1160, at *5 (Del. Ch. Jan. 6, 1989)).

[107] *Clements v. Rogers*, 790 A.2d 1222, 1240 (Del. Ch. 2001).

accurate fashion, which does not create a materially misleading impression."[108] Once

they travel down the road of partial disclosure, fiduciaries "ha[ve] an obligation to

provide the stockholders with an accurate, full, and fair characterization of th[e]

historic events" leading up to the transaction.[109] "[T]he disclosure of even a non-

material fact can, in some instances, trigger an obligation to disclose additional,

otherwise non-material facts in order to prevent the initial disclosure from materially

misleading the stockholders."[110] The Delaware Supreme Court has cautioned that

"[b]oards, committees, and their advisors should take care in accurately describing

the events and the various roles played by board and committee members and their

retained advisors."[111]

"Whether disclosures are adequate is a mixed question of law and fact."[112] "At

the motion to dismiss stage, [the court] need not determine whether each disclosure

---

[108] *Id.*

[109] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1280 (Del. 1994).

[110] *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996).

[111] *City of Sarasota Firefighters' Pension Fund v. Inovalon Hldgs., Inc.*, 319 A.3d 271, 304 (Del. 2024).

[112] *Zirn v. VLI Corp.*, 621 A.2d 773, 777 (Del. 1993); *see Branson v. Exide Elecs. Corp.*, 1994 WL 164084, at *3 (Del. Apr. 25, 1994) (TABLE) (noting that questions of materiality "generally cannot be resolved on a motion to dismiss, but rather . . . must be determined after the development of an evidentiary record"); *Wells Fargo & Co. v. First Interstate Bancorp.*, 1996 WL 32169, at *10 (Del. Ch. Jan. 18, 1996) (declining to rule that an omission was immaterial as a matter of law because "[a] question of materiality is difficult to treat as a question of law on a motion to dismiss," and "[i]n fact, issues of materiality are generally held to be mixed questions of law and fact,

deficiency, alone, is sufficient to find a breach."[113] Rather, the court must "look at the disclosure allegations collectively."[114]

The Complaint states a claim that the Proxy Statement did not contain all material information necessary for the stockholder vote to be fully informed. The facts alleged make it reasonably conceivable that five categories of material information were either omitted or presented in a materially misleading way.

### a. General Atlantic's Conflicts

The first category concerns General Atlantic's conflicts. One conflict was General Atlantic's desire for liquidity. The other conflict was General Atlantic receiving a post-closing dividend of approximately $500 million. Both omissions state reasonably conceivable disclosure claims.

Under Delaware law, stockholders are "entitled to know that certain of their fiduciaries had a self-interest that was arguably in conflict with their own."[115] "Facts that shed light on the depth of a lead negotiator's commitment to the acquirer and

---

but predominantly questions of fact" and "are matters that in many instances require a rich factual context to responsibly decide").

[113] *Davidow v. LRN Corp.*, 2020 WL 898097, at *11 (Del. Ch. Feb. 25, 2020).

[114] *Id.*

[115] *Eisenberg v. Chi. Milwaukee Corp.*, 537 A.2d 1051, 1061 (Del. Ch. 1987).

40

personal economic incentives are generally deemed material to a reasonable stockholder."[116] While serving on this court, Chief Justice Strine explained that

> a reasonable stockholder would want to know an important economic motivation of the negotiator singularly employed by a board to obtain the best price for the stockholders, when that motivation could rationally lead that negotiator to favor a deal at a less than optimal price, because the procession of a deal was more important to him, given his overall economic interest, than only doing a deal at the right price.[117]

"Other precedents support the materiality of information that sheds light on the financial incentives and motivations of directors who are involved in negotiating the deal."[118] Although a proxy statement need not disclose every motive, information is inferably material when it calls into question disclosures about the purpose of the transaction.[119]

### i. General Atlantic's Liquidity Needs

General Atlantic played a central role in the Recapitalization, making its motivations material. Rather than having its banker conduct the outreach to potential buyers, the Committee authorized General Atlantic, Goldman, and Company management to lead the effort. The Committee deferred to General

---

[116] *In re Mindbody, Inc. S'holders Litig.*, 2020 WL 5870084, at *27 (Del. Ch. Oct. 2, 2020).

[117] *In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 114 (Del. Ch. 2007).

[118] *Goldstein v. Denner*, 2022 WL 1671006, at *23 (Del. Ch. May 26, 2022) (citing *In re Columbia Pipeline Gp., Inc.*, 2021 WL 772562, at *34 n.11 (Del. Ch. Mar. 1, 2021) (collecting authorities)).

[119] *Herd v. Major Realty Corp.*, 1990 WL 212307, at *10 (Del. Ch. Dec. 21, 1990); *see Eisenberg*, 537 A.2d at 1059.

41

Atlantic's preferences regarding the timeline and bid process. After Vista made its "curveball" control bid, the Committee allowed General Atlantic to negotiate governance issues with Vista while the Committee was negotiating price, despite understanding that the two were interrelated. When determining whether to accept Vista's bid or ask for more, the Committee sought General Atlantic's "blessing" and waited for General Atlantic "to say ok to price."[120] Information about General Atlantic's motivations is material.

Failing to disclose facts giving rise to a significant need for liquidity can constitute a material omission, and identifying other reasons for pursuing a transaction without identifying a significant need for liquidity can create a partial disclosure problem. Delaware decisions recognize that liquidity constitutes a benefit that can amount to a fiduciary breach.[121] But "liquidity-driven conflicts can be

---

[120] Compl. ¶ 345 (quoting GA_00013002 at 007–08).

[121] *See McMullin v. Beran*, 765 A.2d 910, 921–22, 926 (Del. 2000) (reversing the Court of Chancery's grant of a motion to dismiss a complaint, which alleged that the company's controller and its board designees "sacrific[ed] some of the value of [the target]" to accommodate the controller's "immediate need for cash"); *In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *42 (Del. Ch. Oct. 16, 2018) (finding after trial that two negotiators "had a divergent interest in achieving quick profits by orchestrating a near-term sale" of the company), *aff'd*, 211 A.3d 137 (Del. 2019); *In re Answers Corp. S'holder Litig.*, 2012 WL 1253072, at *7, *9 (Del. Ch. Apr. 11, 2012) (denying a motion to dismiss after concluding that the complaint adequately alleged that a large stockholder's liquidity needs were a source of conflict for the stockholder's two board appointees); *N.J. Carpenters Pension Fund v. infoGROUP, Inc.*, 2011 WL 4825888, at *9–10 (Del. Ch. Sep. 30, 2011) (denying a motion to dismiss after finding that allegations of a CEO's "desperate[]" need for liquidity supported an inference that the "liquidity benefit" constituted "a personal benefit not equally shared by other shareholders"); *Lear*, 926 A.2d at 117 (issuing a preliminary injunction where the CEO, "while negotiating the merger, had powerful

42

difficult to plead,"[122] and Delaware courts "ha[ve] been reluctant to find [that] a liquidity-based conflict" rises to the level of a disabling conflict of interest when a large blockholder receives pro rata consideration because to reach such a conclusion requires drawing the inference that "rational economic actors have chosen to short-change themselves" to secure the near-term liquidity benefit.[123]

The Complaint therefore must allege facts that support a reasonable inference that the liquidity need rose to the level of a disabling conflict. Several decisions from this court have concluded that complaints adequately alleged a divergent interest based on liquidity needs. In *infoGROUP*, the complaint alleged that the blockholder owed $25 million, had no sources of income, recently had paid out $4.4 million, and wanted to start a new business venture.[124] In *Answers*, the complaint alleged that the stockholder wanted to achieve a near-term sale, could not effectively generate liquidity because of the thinly traded market for the company's stock, and curtailed the sale process by taking actions that ran contrary to the advice of the company's investment banker.[125] Most recently, in *Mindbody*, the CEO of the target company

---

interests to agree to a price and terms suboptimal for public investors so long as the resulting deal" yielded certain benefits, including "allow[ing] him to promptly liquidate his equity holdings").

[122] *Mindbody*, 2020 WL 5870084, at *33.

[123] *Larkin v. Shah*, 2016 WL 4485447, at *16 (Del. Ch. Aug. 25, 2016).

[124] *See infoGROUP*, 2011 WL 4825888, at *2, *9.

[125] *See Answers*, 2012 WL 1253072, at *1–2, *7.

candidly explained in a post-merger interview that his capital had been locked up in the company for years and that he had only been able to "sell tiny bits of it" through a Rule 10b5-1 plan, a situation he analogized to "sucking through a very small straw."[126] The complaint also supported an inference that the CEO's "personal finances [were] stretched" leading up to the sale process.[127] Although he did not face a liquidity crisis, he had to meet a series of obligations, including a multi-million pledge to a local college, a seven-figure home renovation project, and payments on a sizeable mortgage.[128] He also wanted to make "a six-figure investment in his son's start-up company, a six-figure loan to a friend, and another six-figure investment in a new venture."[129] Evidencing his focus on liquidity, he drew on a line of credit and increased his periodic sales of stock.[130]

The Complaint adequately pleads that the Proxy Statement omitted material information about General Atlantic's desire for liquidity and its effect on the Recapitalization. It is inferable that General Atlantic needed liquidity by early 2022. The General Atlantic funds holding the investment in the Company were nearing the end of their ten-year lifecycles. Some of the limited partners were pressing to get their

---

[126] *Mindbody*, 2020 WL 5870084, at *3.

[127] *Id.*

[128] *Id.*

[129] *Id.*

[130] *Id.* at *3, *18.

44

capital back. General Atlantic needed cash to a degree that it was contemplating an IPO of its own. Around the same time, Stamas and Bennett met with Vista and asked Goldman to present to the Board on "liquidity for shareholders."[131] When Vista deferred its proposal, General Atlantic and Goldman brainstormed alternatives to generate liquidity, including a secondary offering. The Company subsequently announced a secondary offering of eight million shares owned by General Atlantic, Summit, and management, priced below the prior day's closing price.

It is also inferable that General Atlantic's desire for liquidity shaped the Recapitalization. The bid process letter asked all potential bidders to address the amount of funds to be used for a distribution of proceeds to General Atlantic. When negotiations with Vista ramped up, General Atlantic negotiated governance issues—including its liquidity rights—concurrently with the price negotiations. As part of its demands, General Atlantic introduced the concept of the Company taking on debt to support an additional payout to General Atlantic. At the estimated level of debt in the Recapitalization, General Atlantic was able to sell 74% of its pre-closing equity into the offer, roll over the remaining 26% in exchange for 35% of the post-closing equity, and receive a dividend of $500 million. Internally, General Atlantic recognized the implications of the debt negotiation for the consideration it would receive.[132] The

---

[131] Compl. ¶ 372 (quoting GA_00009400 at 400).

[132] *See id.* ¶ 388 (quoting GA_00003546).

45

Complaint's factual allegations easily support the inference that the Proxy Statement failed to disclose material information about General Atlantic's motivations.

The Complaint also adequately pleads a partial disclosure problem. The Proxy Statement stated that General Atlantic pursued the Recapitalization to provide "liquidity for the unaffiliated security holders of EngageSmart without the delays that would otherwise be necessary in order to liquidate the positions of larger holders, and without incurring brokerage and other costs typically associated with market sales."[133] That statement is inferably misleading as a partial disclosure because it implies that General Atlantic pursued the Recapitalization for the good of the unaffiliated stockholders without disclosing facts necessary to understand General Atlantic's own liquidity needs.

### ii. The $500 Million Dividend

The Proxy Statement also fails to disclose a material term of the Recapitalization: the $500 million dividend. The Proxy Statement discusses that General Atlantic received $23 per share for the shares it sold. The Proxy Statement fails to disclose that the Recapitalization also involved the Company paying General Atlantic $500 million. The Proxy Statement depicted the Recapitalization to the world as a deal in which a controlling stockholder received the same consideration as the public stockholders, when in fact the controlling stockholder secured a secret and undisclosed control premium.

---

[133] Ex. D at 75.

46

The defendants argue that the dividend was immaterial because General Atlantic negotiated the same headline price of $23 per share for all selling stockholders. The defendants argue that because General Atlantic was selling equity at the same price as the public stockholders, General Atlantic's interests were aligned with the public stockholders' interests. But the price the public stockholders received was only one of three forms of consideration that General Atlantic received. General Atlantic also received the $500 million dividend and equity in the post-transaction entity. The funding for the Recapitalization likewise flowed through three channels: (i) Vista's cash contributions, (ii) debt the Company would take on, and (iii) equity that General Atlantic would roll over.

For some dimensions of the Recapitalization, General Atlantic's interests were aligned with the minority stockholders. When General Atlantic negotiated with Vista over how much cash Vista would contribute, General Atlantic had the same goal as the public stockholders: get Vista to contribute as much cash as possible. That was a pie-growing negotiation, because Vista's cash contribution added to the total economic value of the Company.[134] Eventually, some of that cash would go to the selling stockholders, including both General Atlantic and the public minority, and some of it would go to General Atlantic through the dividend. Vis-à-vis Vista, however, everyone on the sell-side had the same interest: get Vista to pay more and

---

[134] *See generally* Alex Edmans, *Grow the Pie: How Great Companies Deliver Both Purpose and Profit* (2020).

create greater overall value for all the Company's stockholders to divide. The same is true for how much debt the Company would take on. The more debt the Company carried, the more cash would be available for the existing stockholders to divvy up, with some going to the selling stockholders and some to fund the dividend.

But the Recapitalization also involved pie-cutting issues. The cash and the post-transaction equity represented a single pie of value that three parties—Vista, General Atlantic, and the public stockholders—would divvy up. Most plainly, the division of cash between the selling stockholders and the dividend was a pie-cutting negotiation in which General Atlantic and the selling stockholders competed for the pool of cash. For that aspect of the Recapitalization, the minority stockholders and General Atlantic had conflicting interests. The minority stockholders wanted the highest purchase price possible, while General Atlantic wanted the maximum consideration across both the purchase price and the dividend. Because General Atlantic stood to receive less than 100% of the purchase price and 100% of the dividend, General Atlantic had an incentive to take more of its consideration through the dividend and less through the purchase price.

The bid process letter shows that General Atlantic had different interests. The letter specifically asked bidders to address "a distribution of proceeds to the non-selling shareholder," code for a side payment to General Atlantic.[135] General Atlantic's internal modeling also illustrated the conflict: a price increase of $0.50 per

---

[135] Compl. ¶ 368 (quoting SA-ESMT0009274 at 275).

share for selling stockholders would result in an overall decrease of approximately $70 million in General Atlantic's total liquidity.

The Proxy Statement therefore could not omit disclosing the post-closing dividend. By failing to disclose that General Atlantic received an additional $500 million, the Proxy Statement created the materially misleading impression that General Atlantic and the public stockholders received the same per-share consideration.

In fact, the disclosure problem was even worse. The Proxy Statement stated that the Committee had considered a merger agreement that contemplated a pre-closing dividend but rejected it because "a pre-closing dividend would have adverse consequences for certain stockholders unaffiliated with General Atlantic."[136] This description gave a misleading impression that the Committee did not authorize a dividend. While the adjective "pre-closing" might technically make the statement correct, it remains misleading. The statement implies that the Committee understood the zero-sum nature of the allocation between the price the selling stockholders received and a dividend for General Atlantic. The disclosure implies that the Committee addressed that conflict and protected the interests of the public stockholders. The Proxy Statement fails to disclose that General Atlantic also received a $500 million post-closing dividend.

---

[136] Ex. D at 46.

49

The Complaint supports a reasonably conceivable inference that the Proxy Statement failed to provide the stockholders with material information about General Atlantic's liquidity motivations. It is reasonable to infer that the stockholder vote was not fully informed.

### b. Financial Advisor Conflicts

The second category of disclosure issues concerns financial advisor conflicts. It is reasonably conceivable that the Proxy Statement omitted material information about Goldman's and Evercore's conflicts.

"Because of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, this Court has required full disclosure of investment banker compensation and potential conflicts."[137] "It does not matter whether the financial advisor's opinion was ultimately influenced by the conflict of interest; the presence of an undisclosed conflict is still significant."[138] "There is no rule that conflicts of interest must be disclosed only where there is evidence that the financial advisor's opinion was actually affected by the conflict."[139] "[I]t is imperative for the stockholders to be able to understand what factors might influence the financial advisor's analytical efforts .

---

[137] *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 832 (Del. Ch. 2011).

[138] *City of Dearborn Police & Fire Revised Ret. Sys. v. Brookfield Asset Mgmt. Inc.*, 314 A.3d 1108, 1132 (Del. 2024).

[139] *Id.* (cleaned up) (quoting *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *16 (Del. Ch. Oct. 2, 2009)).

50

. . ."[140] The key question is whether the information "would have been material to a stockholder in assessing [a financial advisor]'s objectivity."[141] Concurrent engagements with entities and individuals are material facts that must be disclosed to stockholders.[142]

### i. Goldman

The plaintiffs contend that the Proxy Statement falsely portrayed Goldman as a neutral financial advisor for the Company. The Complaint sufficiently alleges that the Proxy Statement omitted material information about Goldman's conflicts of interest with Vista, General Atlantic, and Summit.

A proxy statement must state whether a financial advisor has business relationships with the issuer's transactional counterparty. A financial advisor cannot give a mealy-mouthed disclosure that it "may" have business relationships. The Delaware Supreme Court has twice held that it is materially misleading to use "may" to refer to a financial advisor's then-existing material conflicts with a transactional

---

[140] *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 860 (Del. 2015) (internal quotation marks omitted); *accord Inovalon*, 319 A.3d at 292 & n.118.

[141] *Brookfield*, 314 A.3d at 1132.

[142] *E.g.*, *id.* at 1134 ("[W]e hold that it is reasonably conceivable that the details of Kirkland's conflicts, and particularly, the concurrent conflict, were material facts for stockholders that required disclosure."); *Inovalon*, 319 A.3d at 294 ("Evercore's concurrent representation, in unrelated transactions, of Nordic, the bidder of the Company, and Insight, a co-investor, were material facts.").

51

counterparty.[143] That type of disclosure is incorrect in its own right because the conflict is actual, not possible or potential. It is also misleading in that it "makes it less likely that a stockholder would have been prompted to locate [the financial advisor]'s [counterparty] holdings in its publicly filed form 13F."[144] The Delaware Supreme Court has also found a proxy statement to be materially misleading when it failed to disclose the amounts the financial advisor had received from another transaction party.[145]

According to the Complaint, the Proxy Statement did not disclose that Goldman was concurrently advising Vista (including Wilson) on other transactions for Vista portfolio companies Allvue Systems, LLC and Alegeus Technologies, LLC. The Proxy Statement did not disclose that Goldman was concurrently assisting Vista with a $1 billion cash injection in Finastra in September 2023. The Proxy Statement

---

[143] *Brookfield*, 314 A.3d at 1133; *Inovalon*, 319 A.3d at 293–95.

[144] *Brookfield*, 314 A.3d at 1133.

[145] *Inovalon*, 319 A.3d at 295–97 ("[A]bsent disclosure of the amount of the fees, the stockholders could not compare J.P. Morgan's concurrent fees from counterparties with the fees collected from the Company in this Transaction — approximately $42 million. This lack of disclosure prevented stockholders from contextualizing and evaluating J.P. Morgan's concurrent conflicts of interest. We hold that it is reasonably conceivable that J.P. Morgan's concurrent conflicts with counterparties to the Transaction would have altered the total mix of information available to stockholders and, therefore, should have been disclosed." (footnotes omitted)). *See Brookfield*, 314 A.3d at 1130–33 ("It is reasonably conceivable that from the viewpoint of a stockholder, Morgan Stanley's nearly half a billion-dollar holding in Brookfield was material and would have been material to a stockholder in assessing Morgan Stanley's objectivity. . . .").

did not disclose that Goldman concurrently had a lending relationship with Vista under which Goldman had extended the firm an unsecured $1.5 billion loan. The Proxy Statement did not disclose that Goldman concurrently had a lending relationship with Vista Management Holdings, Inc. under which Goldman had extended that entity a $50 million revolver loan.

Rather than disclosing specific facts about these engagements, the Proxy Statement stated that Goldman "may also in the future provide financial advisory and/or underwriting services to EngageSmart, Vista, General Atlantic and their respective affiliates" for which Goldman "may receive compensation."[146] The Proxy Statement also disclosed that affiliates of Goldman "may have co-invested with Vista, General Atlantic and their respective affiliates from time to time . . . and may do so in the future."[147] The Proxy Statement disclosed that Goldman's investment banking unit received $87.4 million in fees from Vista for services rendered in the past two years.[148]

Those disclosures track the generalized statements that the Delaware Supreme Court found inadequate in *Inovalon.* There, the proxy statement disclosed that the company's financial advisor "may provide financial advisory or other services to the Company and the Acquiror and their respective affiliates, including Nordic

---

[146] Ex. D at 105.

[147] *Id.*

[148] *Id.*

Capital X, GIC, Insight and their respective affiliates" for which the advisor "may receive compensation."[149] The Delaware Supreme Court held that the disclosure was inadequate.[150] The same is true here. It is reasonably conceivable that the Proxy Statement omitted material information about Goldman's relationships with Vista.

The defendants argue that a similar level of disclosure was not required because Goldman was the Company's financial advisor, not the Committee's financial advisor, and because Goldman did not render a fairness opinion. "'[B]ecause of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives,' Delaware courts have required full disclosure of investment banker compensation and potential conflicts."[151] This requirement is not inherently limited to bankers hired by special committees or bankers that render fairness opinions. For example, receiving a fairness opinion from a "supposedly conflict-cleansing" financial advisor with a "secondary" role in the valuation process does not obviate the need for disclosure about the "primary" financial advisor's conflicts.[152]

---

[149] *Inovalon*, 319 A.3d at 293; *see Brookfield*, 314 A.3d at 1133 (proxy statement was misleading when it used "may" to describe an advisor's interest in a counterparty).

[150] *Inovalon*, 319 A.3d at 293–25.

[151] *Id.* at 292 (quoting *Del Monte Foods*, 25 A.3d at 832).

[152] *See RBC Cap. Mkts.*, 129 A.3d at 863–65 ("The Board's receipt of Moelis's financial analysis—which the Special Committee treated as 'secondary' to that of RBC—does not remedy RBC's improper conduct, nor does it destroy the causal link between RBC's actions, the Board's failure to satisfy itself of its fiduciary obligations,

54

Goldman's central role in the sale process renders the defendants' argument untenable. Goldman was the principal banker running the sale process. The Committee authorized Goldman, General Atlantic, and the Company to work together on outreach to potential buyers, and General Atlantic and Goldman shaped the effort. After other bidders had submitted their first-round bids, Goldman tipped Vista with pricing information that no other bidder received. Throughout the process, Goldman tried to sideline Evercore for reasons akin to a middle-school status competition. By trying to exclude Evercore, Goldman impaired the Committee's ability to oversee the transaction process. Having sought to exclude Evercore and thumped its chest internally over its principal role, Goldman cannot now claim its conflicts were immaterial.

The defendants also respond that some of the omitted information was publicly available. Under Delaware law, stockholders are not required to "go on a scavenger hunt" for material information about conflicts,[153] particularly when a proxy statement contains disclosures that could throw a stockholder off the scent. The

and the harm suffered by the Company's stockholders."). *See also Ortsman v. Green*, 2007 WL 702475, at *1–2 (Del. Ch. Feb. 28, 2007). In *Ortsman*, a conflict arose for the company's "lead" advisor for the sale process, so the company retained a second advisor to issue a fairness opinion. *Id.* at *1. According to the complaint, the lead advisor's conflict still impacted the sale process. *Id.* The proxy statement allegedly failed to disclose "issues relating to [the lead advisor]'s conflicted role in the deal" and "fees paid to [the lead advisor] and [the second advisor] in this and other recent transactions involving the members of the buyer group." *Id.* The court found there were "colorable disclosure claims." *Id.* at *2.

[153] *Vento v. Curry*, 2017 WL 1076725, at *3–4 (Del. Ch. Mar. 22, 2017).

55

defendants cannot sidestep their duty to disclose information in the Proxy Statement by saying it might be found elsewhere.

Just as the Complaint states a claim regarding its description (and non-description) of Goldman's conflicts of interest with Vista, the Complaint states a claim regarding Goldman's conflicts of interest with General Atlantic. The same principles of disclosure apply.

The Proxy Statement failed to include material information about Goldman and General Atlantic's long-standing relationship, including concurrent engagements. The Proxy Statement did not disclose that Goldman was concurrently advising General Atlantic in its take-private of HireRight and concurrently advising a General Atlantic portfolio company, Capital Foods, on strategic alternatives. The Proxy Statement did not disclose that Goldman was concurrently advising and marketing at least three General Atlantic funds. The Proxy Statement did not disclose that Goldman was concurrently maintaining lending relationships with General Atlantic, including one €300 million loan, another $150 million loan, and a $50 million revolver. The Proxy Statement did not disclose that Goldman and General Atlantic made co-investments in at least six different companies, including at least one co-investment initiated during the transaction process. It is inferable that Goldman's ties to General Atlantic motivated Goldman to shape the bidding process so that it favored General Atlantic's interests.

The defendants argue that the Proxy Statement disclosed some information about Goldman's relationship with General Atlantic, and that was enough. According

56

to the defendants, no stockholder reading the Proxy Statement could have been confused about Goldman and General Atlantic's relationship or Goldman's role.

Rather than being enough, that type of partial disclosure creates a disclosure problem.[154] "When a document ventures into certain subjects, it must do so in a manner that is materially complete and unbiased by the omission of material facts."[155] "Even if the additional information independently would fall short of the traditional materiality standard, it must be disclosed if necessary to prevent other disclosed information from being misleading."[156] In line with these principles, the Delaware Supreme Court has found a proxy statement to be materially misleading when it contained a partial disclosure of a financial advisor's conflict but failed to make a full disclosure.[157]

---

[154] *See Clements*, 790 A.2d at 1240; *Zirn*, 681 A.2d at 1056.

[155] *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 448 (Del. Ch. 2002).

[156] *PLX Tech.*, 2018 WL 5018535, at *37.

[157] *RBC Cap. Mkts.*, 129 A.3d at 860–63 ("RBC further urges that stockholders reading the Proxy Statement knew that RBC operated with a potential conflict and that disclosure of that potential conflict was sufficient. . . . The Proxy Statement's discussion of RBC's right to offer staple financing was a partial disclosure. . . . The Proxy Statement failed to disclose how RBC used the Rural sale process to seek a financing role in the EMS transaction. Nor did it disclose RBC's courtship of Warburg. When viewed in conjunction with the potential fees RBC was to receive for its financing services, the investment bank's pursuit of Warburg's financing business was demonstrative of a conflict that was unquestionably material, and necessitated full and fair disclosure for the benefit of the stockholders.").

To be sure, the Proxy Statement disclosed that Goldman had a "long-standing relationship" with General Atlantic and therefore "would not be an advisor to the Special Committee."[158] It also disclosed that Goldman's investment banking unit received approximately $45 million in fees from General Atlantic in the two years preceding October 2023.[159] And the Proxy Statement disclosed that General Atlantic and Goldman discussed a potential transaction involving the Company in June and July 2023.[160] It also disclosed that General Atlantic often communicated with the Committee and Evercore "through representatives of Goldman."[161]

But those are partial disclosures. They make the disclosure problems worse, not better.

Finally, the Complaint supports a reasonably conceivable inference that the Proxy Statement omitted material information about Goldman's relationship with Summit. The Proxy Statement failed to disclose that Goldman earned approximately $25 million in fees from Summit in the prior two years. While that might seem like small potatoes in the financial world, a Summit representative served on the Committee, making the relationship material. It is also a partial disclosure problem

---

[158] Ex. D at 33, 35.

[159] *Id.* at 105.

[160] *Id.* at 32.

[161] *Id.* at 47–49.

because Goldman disclosed some facts about its relationships with other transaction participants, suggesting that Goldman had no relationship with Summit.

### ii. Evercore

The plaintiffs similarly contend that the Proxy Statement gave a false and misleading impression about the extent of Evercore's conflicts. The Complaint sufficiently alleges that the Proxy Statement omitted material information about Evercore's relationships with General Atlantic, Vista, and Summit.

Compensation a financial advisor has received from another transaction party can be material to a stockholder trying to evaluate the advisor's objectivity and conduct.[162] Information about prior engagements provides insight into the magnitude of a relationship.[163] Although a brightline disclosure requirement would make a lot

---

[162] *E.g.*, *Inovalon*, 319 A.3d at 295–97; *Rodden v. Bilodeau*, C.A. No. 2019-0176-JRS, at 18, 20–21 (Del. Ch. Jan. 27, 2020) (TRANSCRIPT); *Kihm v. Mott*, 2021 WL 3883875, at *18 (Del. Ch. Aug. 31, 2021) ("When a financial advisor faces a conflict, this Court has generally required disclosure of the relationship itself and the amount of fees the advisor received. It has rejected requests for more granular details about the specific services rendered by the advisor, or overlapping deal team members." (internal quotation marks and footnotes omitted)), *aff'd*, 276 A.3d 462 (Del. 2022) (TABLE); *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *11 (Del. Ch. Mar. 31, 2017) ("What was material, and disclosed, was the prior working relationship and the amount of fees.").

[163] *Rodden v. Bilodeau*, C.A. No. 2019-0176-JRS, at 18, 20–21 (Del. Ch. Jan. 27, 2020) (TRANSCRIPT) (finding it reasonably conceivable that payments in the two years preceding the merger to its financial advisor totaling $9 million (consisting of $4.9 million by the target and $4.1 million by the acquirer) would be deemed material because disclosure of those payments would help the target's stockholders to "contextualize the magnitude of the [financial advisor]'s conflict of interest"). *See Inovalon*, 319 A.3d at 297 (holding that proxy statement's disclosure that advisor received "customary compensation" without disclosing the amount of fees "prevented

59

of sense and be easier to administer, "there is no hard and fast rule that requires financial advisors to always disclose the specific amount of their fees from a counterparty in a transaction."[164] "Rather, the materiality standard governs whether a financial advisor's exact amount of fees collected from a counterparty to a transaction requires disclosure."[165]

The Proxy Statement did not disclose that in the past five years, Evercore earned (i) approximately $41 million from General Atlantic, (ii) approximately $18.5 million from Vista, and (iii) approximately $36 million from Summit and its portfolio companies. The Proxy Statement also did not disclose that Evercore was concurrently advising Summit on at least one transaction, that Hamilton told a colleague that when hiring the Committee's financial advisor, he was "trying to curry favor with some places that tend to show [Summit] more deal flow,"[166] or that after the parties agreed to the Recapitalization, Hamilton told his colleague to leverage the Evercore engagement to secure another Evercore-advised deal.[167]

---

stockholders from contextualizing and evaluating J.P. Morgan's concurrent conflicts of interest").

[164] *Inovalon*, 319 A.3d at 296.

[165] *Id.*

[166] Compl. ¶ 110 (quoting SC-00000823 at 824).

[167] *Id.* ¶ 192 (quoting SC-00006113 at 113–14).

Instead, the Proxy Statement stated only that Evercore and affiliates "have provided financial advisory services" to General Atlantic, Vista, and their respective affiliates and portfolio companies, and "received fees for the rendering of these services."[168] The Proxy Statement also stated that Evercore and its affiliates "may provide" similar services and "may receive compensation" in the future.[169]

As with similarly generic statements about Goldman, those statements about Evercore are materially misleading. The Complaint supports an inference that Evercore received material amounts of fees from General Atlantic, Vista, and Summit. Those amounts needed to be disclosed. The Complaint also supports an inference that the Proxy Statement was materially misleading because it failed to disclose that Hamilton retained Evercore in part to generate additional deal-flow for Summit.

### c. The Players' Roles

A third category of disclosure issues involves the respective roles of Goldman, Evercore, and the Committee. The section of a proxy statement that describes the background of the transaction is not a roadshow sales document. It calls for a factually accurate description of what took place. "Boards, committees, and their advisors should take care in accurately describing the events and the various roles

---

[168] Ex. D at B-3.

[169] *Id.*

61

played by board and committee members and their retained advisors."[170] A disclosure that suggests "a more active role for [the special committee's advisor] takes on added significance in a scenario where [the company's advisor], as the lead advisor, faced conflicts."[171] In *Inovalon*, the Delaware Supreme Court found the proxy misleading because it portrayed the special committee's advisor as being "in a better position than it actually was to mitigate any effects of [the company advisor]'s conflicts," and where the special committee advisor's own conflicts and its "secondary and more limited role in the outreach process" limited its effectiveness.[172] Allegations about advisor conflicts and a special committee's more limited role "could make a difference to stockholders in analyzing and weighing the advice of the advisors and in evaluating the overall effectiveness of the market outreach."[173]

The Proxy Statement portrayed the Committee as leading the process. It claimed that the Committee "had independent control of the extensive negotiations with the members of [General Atlantic and Vista] and their respective advisors on behalf of the unaffiliated security holders."[174] It asserted that the Committee had extensive arm's length negotiations with General Atlantic, Vista, and other bidders.

---

[170] *Inovalon*, 319 A.3d at 304.

[171] *Id.*

[172] *Id.*

[173] *Id.*

[174] Ex. D at 76–77.

It described Evercore and Goldman as co-advisors on process decisions, bidder outreach, and negotiations.

The Complaint pleads facts that undercut those descriptions. General Atlantic and Goldman inferably sidelined the Committee and Evercore on process decisions, bidder outreach, and negotiations. General Atlantic and Goldman drove the decision to limit the canvass to financial buyers interested in a minority position. Goldman then excluded Evercore from transaction-related communications, resulting in General Atlantic and Goldman engaging directly with bidders without input from the Committee or Evercore. General Atlantic negotiated pricing and governance terms with Vista directly and concurrently. Rather than making the final decision on price, the Committee waited for General Atlantic's blessing.

At the pleading stage, the Complaint supports an inference that the process actually unfolded quite differently than what the Proxy Statement depicts. The Complaint's allegations rely on contemporaneous internal documents, not mere allegations. It is reasonably conceivable that the Proxy Statement was materially misleading when depicting the Committee as having independent control of negotiations with General Atlantic and Vista.

### d.    Other Bidders

The fourth category of disclosure issues concerns other bidders. The Complaint supports a reasonable inference that the Proxy Statement misleadingly described the interactions with other bidders and created a false impression that there were no other credible bidders.

63

"In cases involving publicly traded companies, sell-side fiduciaries must provide their stockholders with an accurate, full, and fair description of significant meetings or other interactions between target management and a bidder."[175] Third party inquiries and informal offers are material and must be disclosed.[176] At the same time, proxy materials need not state "insignificant details,"[177] nor must they state the "plaintiff's characterization of the facts."[178]

The Proxy Statement did not disclose that Francisco Partners and Hg Capital were actively evaluating the Company and working toward improving their offers during the bid solicitation period. The Proxy Statement states that Hg Capital "never requested a dinner meeting," but that was not true.[179] The Proxy Statement also

---

[175] *In re Columbia Pipeline Gp., Inc. Merger Litig.*, 299 A.3d 393, 486–87 (Del. Ch. 2023), *rev'd on other grounds*, 342 A.3d 324 (Del. 2025); *see In re Mindbody, Inc. S'holder Litig.*, 2023 WL 2518149, at *39 (Del. Ch. Mar. 15, 2023) ("Although a fiduciary need not give a play-by-play account, when fiduciaries choose to provide the history of a transaction, they have an obligation to provide shareholders with an accurate, full, and fair characterization of those historic events." (internal quotation marks omitted)), *aff'd in part, rev'd in part on other grounds*, 332 A.3d 349 (Del. 2024).

[176] *In re Grace Energy Corp. S'holders Litig.*, 1992 WL 145001, at *5 (Del. Ch. June 26, 1992).

[177] *In re Merge Healthcare Inc. S'holders Litig.*, 2017 WL 395981, at *9 (Del. Ch. Jan. 30, 2017).

[178] *Teamsters Loc. 677 Health Servs. & Ins. Plan v. Martell*, 2023 WL 1370852, at *15 n.168 (Del. Ch. Jan. 31, 2023) (internal quotation marks omitted).

[179] Ex. D at 46.

64

misleadingly describes Francisco Partners' and Hg Capital's feedback during the go-shop period.

This is another example of parties inferably treating the Proxy Statement like a roadshow sales pitch. It is reasonable to infer that the disclosures regarding alternative bidders failed to provide the stockholders with the material information necessary for the vote to be fully informed.

### e. Hamilton's Independence

The fifth category of disclosure issues concerns Hamilton's independence. Although it is not reasonably conceivable that the Proxy Statement omitted material information about Hamilton's independence as it relates to Summit's liquidity interests, it is reasonably conceivable that the Proxy Statement omitted material information about Hamilton's ties to General Atlantic and Vista, as well as his use of his role on the Committee to generate good will for Summit.

"A director's conflict with a transactional counterparty is material information that should be disclosed."[180] "In fact, a director's *potential* conflict with a transactional counterparty is material information that should be disclosed."[181] "Where . . . omitted information goes to the independence or disinterest of directors who are identified as the company's 'independent' or 'not interested' directors, the relevant inquiry is not

---

[180] *Tornetta v. Musk*, 310 A.3d 430, 522–23 (Del. Ch. 2024), *rev'd on other grounds sub nom. In re Tesla, Inc. Deriv. Litig.*, 2025 WL 3689114 (Del. Dec. 19, 2025).

[181] *Id*. at 523.

whether an actual conflict of interest exists, but rather whether full disclosure of potential conflicts of interest has been made."[182]

The plaintiffs allege that the Proxy Statement's description of Hamilton's independence was misleading because Summit, like General Atlantic, faced a liquidity conflict. But the Complaint's allegations do not support that inference. As a large stockholder that sold into the transaction, Summit's interests were generally aligned with the other minority stockholders.

As discussed previously, the failure to disclose facts supporting a material desire for liquidity can give rise to a material omission. But here, the plaintiffs' sole basis for asserting that Summit needed liquidity was that its funds were approaching the end of their ten-year lifecycle.

That allegation closely resembles what the court has rejected as insufficient.[183] Investment fund managers cycle through a multi-year process of raising capital for a

_____

[182] *Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.*, 824 A.2d 11, 15 (Del. Ch. 2002) (internal quotation marks omitted).

[183] *See, e.g.*, *Firefighters' Pension Sys. of City of Kan. City, Mo. Tr. v. Presidio, Inc.*, 251 A.3d 212, 258–59 (Del. Ch. 2021) (collecting cases); *Mindbody*, 2020 WL 5870084, at *34 (rejecting liquidity-driven conflict theory on a fixed-life investment fund having "a 2018 target date to liquidate its Mindbody investment," which already had passed by the time of the sale); *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *19 (Del. Ch. Oct. 24, 2014) (rejecting liquidity-driven conflict theory advanced in complaint that alleged that investment firm "usually holds its assets for five years, but has held its interest in [the relevant company] for eight" and that the firm's "longer-than-normal investment in [the company] reflected the illiquid size of its control block"); *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 667–68 (Del. Ch. 2013) (rejecting liquidity-driven conflict theory based on allegation that private equity fund "pressured the board to sell Morton's quickly" so that it could either "get some liquidity to reinvest in its new [fund]" or "cash out the investors in

new fund, launching the fund, investing the fund's capital, managing the investments, and then harvesting the investments, with the industry standard for a fund's lifespan generally set at ten years. The desire to wrap up an existing fund or provide investors with realizations can affect a fund manager's incentives.[184] But the process "is not so formulaic and structured that the cycle itself would support an inference of a liquidity-based conflict."[185] Put differently, the business model alone does not create a problematic interest.[186]

The plaintiffs therefore had to plead more to support an inference that Summit's interest in liquidity gave rise to a conflict for Hamilton. The Complaint fails in that effort.

---

[Morton's] [so that] those investors would have money to reinvest in [the new fund]"); *see also Chen v. Howard-Anderson*, 87 A.3d 648, 671–72 (Del. Ch. 2014) (granting summary judgment after rejecting liquidity-driven conflict theory, which argued that institutional investor supported a near-term sale so that it could wind down a fund that was scheduled to terminate a year earlier).

[184] *Presidio*, 251 A.3d at 258; *see Frederick Hsu Living Tr. v. Oak Hill Cap. P'rs III, L.P.*, 2020 WL 2111476, at *8–18 (Del. Ch. May 4, 2020) (detailing evidence that established that private equity fund manager instructed its partners to focus on achieving exits and monetizing investments to show returns of capital that would be favorable for raising a new fund); *In re Trados Inc. S'holder Litig.* (*Trados I*), 2009 WL 2225958, at *2 & n.2, *7 (Del. Ch. July 24, 2009) (reviewing internal emails and reports which showed that fund managers wanting to sell quickly to close out a long-held investment to focus on other, more promising investments).

[185] *Presidio*, 251 A.3d at 258.

[186] *Id.*; *Larkin*, 2016 WL 4485447, at *15–17.

By contrast, the Proxy Statement inferably omits material information about Hamilton's ties to General Atlantic and Vista. Summit has long-standing ties to both firms spanning over a decade that would inferably cause Hamilton to favor General Atlantic and Vista's interests to preserve those relationships. A generalized allegation about a historical relationship would not be sufficient, but the Complaint's allegations are specific, detailed, and lengthy:

- In 2014, Vista acquired an on-demand talent management solutions provider in which Summit was a substantial investor.

- In 2017, Vista acquired a software company from Summit. Also in 2017, General Atlantic provided an exit for Summit by purchasing its stake in a consumer analytics company.

- In 2018, Vista sold Summit a majority stake in a global provider of cloud-based financial software while retaining a minority interest. Also in 2018, General Atlantic acquired Summit's stake in a French fashion brand as part of its purchase of a 45% interest. And in 2018, General Atlantic acquired a majority stake in the Company, where Summit was already a significant investor.

- In 2019, General Atlantic and Summit acquired a majority stake in a beauty company and co-invested in its parent.

- In 2020, Vista purchased a majority stake in a customer-relations technology company backed by Summit.

- In 2021, General Atlantic invested $163 million in a cloud-based software provider, supporting prior investments by Summit totaling $305 million. Also in 2021, General Atlantic and Summit jointly took the Company public. They are also parties to the Governance Agreement.

- In early 2022, just months before the Committee was formed, a General Atlantic portfolio company acquired a Summit portfolio company Appway with Summit retaining a minority interest.

- In February 2023, General Atlantic invested in an operations management software provider as part of a $100 million round where Summit was an existing investor and also participated in the round.

- In 2024, General Atlantic acquired a majority stake in a sustainability assessment provider from Summit, which retained a minority position.

At this point in history, there are approximately 19,000 private equity funds in the United States, outnumbering the 14,000 McDonald's locations by a sizable margin.[187] There are around 4,500 public companies, plus around 215,000 private equity-backed or venture capital-backed portfolio companies.[188] Given those figures, the base rate of incidental, non-relationship-based firm-to-firm interaction should be relatively low, making the degree of interaction among Summit, General Atlantic, and Vista inferably significant.

In addition to those historical relationships, the Complaint alleges that when the Committee looked for a financial advisor, Hamilton told a colleague that he was "trying to curry favor with some places that tend to show [Summit] more deal flow."[189] After the parties agreed to the Recapitalization, Hamilton learned that a colleague was "chasing" a deal involving an Evercore client. Hamilton told his colleague that he delivered "$25M to EVR for a short sprint"[190] and that the colleague should "use

---

[187] Sridhar Natarajan & Allison McNeely, *'Crazy, Right?': More PE Funds Than McDonald's Signals Pressure*, *Bloomberg* (Oct. 1, 2025), bloomberg.com/news/articles/2025-10-01/-crazy-right-more-pe-funds-than-mcdonald-s-signals-pressure.

[188] *How does the size of private markets compare to public markets?*, HarbourVest, https://www.harbourvest.com/insights-news/insights/cpm-how-does-the-size-of-private-markets-compare-to-public-markets/.

[189] Compl. ¶ 110 (quoting SC-00000823 at 824).

[190] *Id.* ¶ 192 (quoting SC-00006113 at 113–14).

that to win your deal."[191] Those comments inferably reflect how Hamilton thought about his role on the Committee and his ability to use it to benefit Summit. It is also pertinent that one of Vista's representatives thought Summit would have a conflict for purposes of a Vista-related transaction.[192] Although not dispositive, the comment reflects an insider's assessment of the relationship.

At the pleading stage, the court cannot ignore what these allegations suggest about Hamilton's independence. At a later stage of the case, Hamilton and Summit may explain them adequately. At the pleading stage, it is reasonably conceivable that the Proxy Statement omitted material information and created a partial disclosure problem by portraying Hamilton as independent and stating only that Summit and General Atlantic "invested in the same portfolio companies."[193]

### f. Information Regarding Post-Transaction Plans

Finally, the plaintiffs allege that the Proxy Statement failed to disclose that Vista shared a value creation plan with Company management that involved making operational changes and then selling the Company's principal business. That type of detail might be interesting, and it can be relevant to litigation, but it was not material to stockholders when voting on a cash deal.

---

[191] *Id.* (quoting SC-00006113 at 113–14).

[192] *Id.* ¶ 71.

[193] Ex. D at 29.

70

### 3. Entire Fairness Applies.

The disclosure violations prevent the *MFW* governance interventions from lowering the standard of review to an irrebuttable version of the business judgment rule. The Recapitalization is inferably governed by the entire fairness standard of review, and the defendants accept that the claims for breach of fiduciary duty can move forward under that standard.

## B. Exculpation

Rodriguez, Dunnam, Hamilton, and Bennett seek dismissal on the basis of exculpation. Rodriguez's motion succeeds. Dunnam, Hamilton, and Bennett may succeed at a later stage, but for now, the Complaint sufficiently pleads non-exculpated claims against them.

Section 102(b)(7) of the Delaware General Corporation Law authorizes a certificate of incorporation that shields directors from monetary liability for a breach of the duty of care.[194] The Company's certificate of incorporation contains an exculpation provision.[195]

Since 2015, "[a] plaintiff seeking only monetary damages must plead non-exculpated claims against a director who is protected by an exculpatory charter provision to survive a motion to dismiss, regardless of the underlying standard of

---

[194] 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 6.02[7], at 6-18 (2022); *accord Presidio*, 251 A.3d at 253 & n.5.

[195] Ex. A, art. VI, § 1(a).

review for the board's conduct—be it *Revlon, Unocal*, the entire fairness standard, or the business judgment rule."[196] To plead a non-exculpated claim, a complaint must allege "facts supporting a rational inference" that the director (1) "harbored self-interest adverse to the stockholders' interests," (2) "acted to advance the self-interest of an interested party from whom they could not be presumed to act independently," or (3) "acted in bad faith."[197]

"[E]ach director has a right to be considered individually," and "the mere fact that a director serves on the board of a corporation with a controlling stockholder does not automatically make that director not independent."[198] "So applied, the existence of an exculpatory provision operates more in the nature of an immunity, comparable to the extent to which sovereign immunity typically protects government employees from suit, rather than as an affirmative defense."[199]

### 1. Rodriguez

The Complaint fails to plead a non-exculpated claim against Rodriguez. Because he is a facially independent and disinterested director, the Complaint must

---

[196] *Cornerstone*, 115 A.3d at 1175–76 (footnotes omitted).

[197] *Id.* at 1179–80.

[198] *Id.* at 1182–83.

[199] *In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 130 A.3d 934, 940 (Del. Ch. 2016).

allege facts supporting an inference that he nevertheless acted disloyally or in bad faith.[200] It falls short.

The duty of loyalty requires that disinterested, independent directors act in good faith.[201] A director fails to act in good faith when "the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation."[202] A plaintiff can call into question a director's good faith by pleading facts supporting an inference that the director acted for some other purpose.[203] "Bad faith can be the result of "any human emotion [that] may cause a director to [intentionally] place his own interests, preferences or appetites before the welfare of the corporation," including greed, "hatred, lust, envy, revenge, . . . shame or pride."[204]

---

[200] *Cornerstone*, 115 A.3d at 1179–80.

[201] *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *1 (Del. Ch. May 20, 2016).

[202] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006).

[203] *Id.* at 53 (noting that Delaware law "clearly permits a judicial assessment of director good faith" at the pleading stage); *accord eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 40 (Del. Ch. 2010).

[204] *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (Allen, C.); *see Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) ("The reason for the disloyalty (the faithlessness) is irrelevant, the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious action not in the corporation's best interest does not make it faithful, as opposed to faithless.").

A director can also act in bad faith by engaging in an "intentional dereliction of duty" such as by showing a "conscious disregard for one's responsibilities."[205]

The standard for bad faith is *not* whether the action taken is "so beyond the bounds of reasonable judgment that it seems essentially inexplicable on any other ground."[206] The Delaware Supreme Court rejected that standard in *Kahn v. Stern,* where the justices considered an appeal from a decision that declined to draw a pleading-stage inference that directors had acted in bad faith.[207] While agreeing with the result, Chief Justice Strine went out of his way to state that

> to the extent that the Court of Chancery's decision might be read as suggesting that a plaintiff in this context must plead facts that rule out any possibility other than bad faith, rather than just pleading facts that support a rational inference of bad faith, we disagree with that statement.[208]

In support, he cited *Brinckerhoff*, a 2017 decision in which the Delaware Supreme Court overruled an earlier precedent in which the justices had used the standard of "so far beyond the bounds of reasonable judgment that it seems essentially

---

[205] *Disney*, 906 A.2d at 66; *accord Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 240 (Del. 2009).

[206] *Leung v. Schuler*, 2000 WL 1478538, at *6 (Del. Ch. Oct. 2, 2000), *aff'd*, 783 A.2d 124 (Del. 2001) (TABLE), *abrogated by Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 258–60 (Del. 2017), *and Kahn v. Stern*, 183 A.3d 715, 715 (Del. 2018) (TABLE).

[207] *Kahn*, 183 A.3d at 715.

[208] *Id.*

74

inexplicable on any ground other than bad faith."[209] The *Brinckerhoff* decision held that to plead action not in good faith, a plaintiff need only plead facts supporting an inference that the defendant did not reasonably believe that the transaction was in the best interests of the entity or its equity holders.[210]

To be sure, showing that conduct is "inexplicable on any ground than bad faith" remains one means of establishing bad faith, but a plaintiff is not required to plead facts meeting that standard to survive a motion to dismiss. A plaintiff need not "plead facts that rule out any possibility other than bad faith."[211] At trial, a plaintiff need not rule out other explanations; the plaintiff need only show by a preponderance of the evidence that the fiduciary acted for a purpose other than the best interest of the corporation.[212] Likewise, at the pleading stage, a plaintiff need only plead facts supporting a reasonably conceivable inference that the fiduciary acted for a purpose other than the best interest of the corporation.

Under Rule 9(b), a plaintiff can plead knowledge generally.[213] That means the plaintiff must plead facts which, when viewed holistically, support a reasonable

---

[209] *Id.* at 715 n.5 (citing *Brinckerhoff*, 159 A.3d at 258–60).

[210] *Brinckerhoff*, 159 A.3d at 258–60.

[211] *Kahn*, 183 A.3d at 715.

[212] *See Brinckerhoff*, 159 A.3d at 259–60.

[213] Ct. Ch. R. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

inference that the person could have acted with the requisite mental state. "Even after a trial, a judge may need to make credibility determinations about a defendant's subjective beliefs by weighing witness testimony against objective facts."[214] And even then, the members of the Court of Chancery "cannot peer into the hearts and souls of directors to determine their subjective intent with certainty."[215] "Without the ability to read minds, a trial judge only can infer a party's subjective intent from external indications."[216] "Objective facts remain logically and legally relevant to the extent they permit an inference that a defendant lacked the necessary subjective belief."[217]

"Although lawyers routinely object that witnesses cannot speculate about someone else's state of mind, there is actually nothing special about it."[218]

> While "mind reading" might sound like a mentalist magic trick, for cognitive scientists it refers to the very pedestrian capacity we all have for figuring out what another human being is thinking. . . . Other people's minds are opaque to us, so we cannot observe them directly. And yet, when someone walks toward the water fountain on a hot day, we know she wants a drink. When someone yelps after stubbing her toe, we know she feels pain. When someone aims an arrow at a target, we

---

[214] *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 106 (Del. 2013).

[215] *Id.* (internal quotation marks omitted).

[216] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 178 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (TABLE).

[217] *Id.*

[218] *Firefighters' Pension Sys. of City of Kansas City v. Found. Bldg. Materials, Inc.*, 318 A.3d 1105, 1164 (Del. Ch. 2024).

know she intends to hit it. We take in observable data about a person and infer something about her unobservable mental life.[219]

"To get at a person's unobservable mental state, we look at what the person did and the circumstances in which they did it."[220]

Allegations of bad faith do not require a smoking gun. As Chancellor Allen explained:

> Rarely will direct evidence of bad faith—admissions or evidence of conspiracy—be available. Moreover, due regard for the protective nature of the stockholders' class action, requires the court, in these cases, to be suspicious, to exercise such powers as it may possess to look imaginatively beneath the surface of events, which, in most instances, will itself be well-crafted and unobjectionable.[221]

Chancellor Allen made those observations when ruling on a preliminary injunction application, after the plaintiff had the opportunity to conduct discovery and take depositions. At the pleading stage, his admonition carries even greater weight.

Here, however, the plaintiffs have not pled enough. They allege that Rodriguez acted in bad faith because he repeatedly deferred to General Atlantic and Goldman, did not heed Evercore's advice, and failed alongside his fellow Committee member to be assertive enough or negotiate meaningfully.

---

[219] Mihailis E. Diamantis, *How to Read a Corporation's Mind*, in *The Culpable Corporate Mind* 222–23 (Elise Bant ed., 2023).

[220] *Found. Bldg.*, 318 A.3d at 1164.

[221] *In re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147, at *12 (Del. Ch. Aug. 8, 1988).

For Rodriguez, these allegations could at most support an exculpated breach of the duty of care. The Complaint tries to introduce a soupçon of disloyalty by observing that Goldman recommended Rodriguez to the Board, Stamas and Osnoss previously worked at Goldman, and Rodriguez served on Harvard Business School's Global Advisory Board when Stamas and Osnoss studied there. Those allegations are sufficiently weak that they underscore the absence of any meaningful reason to question Rodriguez's independence.

Rodriguez is therefore dismissed. The dismissal is necessarily interlocutory. If discovery shows that Rodriguez had a more significant and compromising role, then subject to the law of the case doctrine, the plaintiffs could seek to revisit the dismissal, if good cause exists for doing so.[222]

### 2. Dunnam

Dunnam is also a facially disinterested and independent director. But her situation differs from Rodriguez's in two respects. First, General Atlantic recommended her to the Board, but took pains not to designate her as a General Atlantic director—even though she was replacing a General Atlantic designee. Second, the Board initially appointed Dunnam as a member of the Committee, but

---

[222] *See Zirn v. VLI Corp.*, 1994 WL 548938, at *2 (Del. Ch. Sep. 23, 1994) ("Once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears.").

she resigned because General Atlantic had introduced her to a professional opportunity.

The plaintiffs seek an inference that because General Atlantic recommended Dunnam as a director and advanced her career, she inferably approved the Recapitalization as part of a quid pro quo. A director's nomination to a board, standing alone, is not enough to call into question the director's independence from the nominating party.[223] Here, the non-designation is a bit fishy, but still not enough.

But the professional opportunity points to something more. In work that focuses on relationships with controlling stockholders, Professor Da Lin has explored

---

[223] *E.g.*, *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984) (subsequent history omitted) ("[I]t is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director. It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence."); *Goldstein*, 2022 WL 1671006, at *2 ("Although a director's nomination to a board standing alone is not enough to call into question the director's independence from the nominating party, a pattern of facts surrounding the director's service can do the trick."); *In re Viacom Inc. S'holders Litig.*, 2020 WL 7711128, at *21 n.238 (Del. Ch. Dec. 29, 2020) ("The Viacom Committee Defendants contend the mere fact a director was appointed to the board by an interested stockholder does not alone compromise that director's independence. . . . I agree."); *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 996 (Del. Ch. 2014) ("It is well-settled Delaware law that a director's independence is not compromised simply by virtue of being nominated to a board by an interested stockholder."), *aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015); *S. Muoio & Co. LLC v. Hallmark Ent. Invs. Co.*, 2011 WL 863007, at *10 (Del. Ch. Mar. 9, 2011) ("The mere nomination of a director by a majority stockholder, however, is insufficient to demonstrate lack of independence."), *aff'd*, 35 A.3d 419 (Del. 2011).

the ability of directors to be influenced by the prospect of reward.[224] By examining the professional connections between directors and controllers, she finds that some controllers regularly reappoint cooperative independent directors to executive and board positions at other firms.[225] She also explores how different types of controllers have differing abilities to reward directors. She finds that controllers with wider bases of investments are much more likely to have repeat relationships with the nominally independent directors who serve on their boards.[226] She recommends that courts take a more nuanced approach to independence that accounts for the ability of some controllers who are repeat players to reward nominally independent directors.[227]

The same insights apply to investment funds that can appoint individuals to multiple boards over time.[228] Lin observes that venture capital and private equity firms are repeat players with substantial opportunities to reward directors.[229] Other

---

[224] Da Lin, *Beyond Beholden*, 44 J. Corp. L. 515, 517–18 (2019) (presenting empirical research showing directors' behavior is sensitive to both fear of losing board seats and reward of obtaining additional board seats).

[225] *Id.*

[226] *Id.* at 543–46.

[227] *Id.* at 543–46, 549–50.

[228] *Id.* at 544–46.

[229] *Id. See* Jesse M. Fried & Mira Ganor, *Agency Costs of Venture Capitalist Control in Startups*, 81 N.Y.U. L. Rev. 967, 989 n.63 (2006) (noting that "conversations with local VCs confirm" that "independent directors" have incentives to side with VCs); D. Gordon Smith, *The Exit Structure of Venture Capital*, 53 UCLA

research has found similar repeat-player effects for bankruptcy directors.[230] Scholars identified a phenomenon in which independent directors join a board around the time that the company files for Chapter 11. The new directors are held out as independent and empowered to make key decisions regarding the bankruptcy. The scholars note, however, that the new directors

> suffer from a structural bias resulting from being part of a closely-knit community: a handful of private equity sponsors that control distressed companies routinely turn to a handful of law firms for representation and—per their advice—pick these bankruptcy directors from a small pool.[231]

The scholars argue that the dynamics of a small network of repeat players and the prospect of future engagements are sufficient to call into question the directors' independence.

At present, the Complaint contains scant information about the nature of the professional opportunity. Yet the opportunity was sufficient to cause Dunnam to withdraw from the Committee. It may be that Dunnam was being careful and that the opportunity would not foreclose exculpation. Depending on the facts, it may be

---

L. Rev. 315, 320 (2005) ("[I]n the event of conflict between the venture capitalist and the entrepreneur, such outside directors may have a natural inclination to side with the venture capitalist."); William W. Bratton, *Venture Capital on the Downside: Preferred Stock and Corporate Control*, 100 Mich. L. Rev. 891, 921 (2002) (arguing outside directors are "highly susceptible to the influence of the *VC*").

[230] Jared A. Ellias, Ehud Kamar & Kobi Kastiel, *The Rise of Bankruptcy Directors*, 95 S. Cal. L. Rev. 1083, 1086–90 (2022).

[231] *Id.* at 1136.

possible to address the issue after limited discovery through a motion for summary judgment. That determination, however, cannot be made at the pleading stage. Dunnam is not presently entitled to exculpation.

### 3. Hamilton

Hamilton is not entitled to exculpation at the pleading stage. As both a director of the Company and a managing director of Summit, he faced the dual-fiduciary problem identified in *Weinberger,* in which the Delaware Supreme Court held that "[t]here is no dilution of [fiduciary] obligation" when a director holds "dual or multiple" fiduciary positions and "no 'safe harbor' for such divided loyalties in Delaware."[232] "If the interests of the beneficiaries to whom the dual fiduciary owes duties are aligned, then there is no conflict. But if the interests of the beneficiaries diverge, the fiduciary faces an inherent conflict of interest."[233]

This decision has drawn a pleading-stage inference that Summit had compromising ties to General Atlantic and Vista because of the firms' history of overlapping and mutually beneficial transactions. This decision has also noted that when selecting a banker, Hamilton told a colleague that he was "trying to curry favor with some places that tend to show [Summit] more deal flow,"[234] and after the

---

[232] *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983).

[233] *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 46–47 (Del. Ch. 2013) (citation omitted); *accord Chen*, 87 A.3d at 670.

[234] Compl. ¶ 110 (quoting SC-00000823 at 824).

transaction was approved, told a colleague to use the Evercore engagement "to win your deal."[235] Those comments show how Hamilton thought about his ability to use his role on the Committee to benefit Summit. Plus, a Vista representative thought Summit would have a conflict for purposes of a Vista-related transaction.[236]

Those allegations support an inference that Summit's interests diverged from those of the minority stockholders, creating a conflict of interest for Hamilton as a dual fiduciary. The Complaint's allegations support an inference that Hamilton hired Evercore to generate benefits for Summit. Hamilton also favored General Atlantic's interests during the sale process by rejecting Evercore's advice and approving the bid process letter that General Atlantic wanted. At the pleading stage, he is not entitled to exculpation.

#### 4. Bennett

Bennett is not entitled to exculpation. Bennett was not only a director but also the Company's CEO. Through a change-of-control agreement, Bennett received lucrative retirement benefits as a result of the Recapitalization.

Bennett was not independent of General Atlantic. A fiduciary is not independent when "the fiduciary is 'sufficiently loyal to, beholden to, or otherwise influenced by an interested party' to undermine the fiduciary's ability to judge the

---

[235] *Id.* ¶ 192 (quoting SC-00006113 at 113–14).

[236] *Id.* ¶ 71.

matter on its merits."[237] Bennett was a corporate officer in a controlled company. "Under the great weight of Delaware precedent, senior corporate officers generally lack independence for purposes of evaluating matters that implicate the interests of either a controller or a conflicted board majority."[238]

Bennett was also interested in the Recapitalization. "A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders."[239] Through his change-in-control arrangements, Bennett stood to reap approximately $11 million through change-of-control payments and cashing out of otherwise illiquid restricted stock and unvested equity incentive plan awards.[240] Those benefits rendered Bennett interested in the Recapitalization.[241]

In two decisions, this court has suggested that change-in-control benefits cannot not create a conflict of interest as a matter of law when those benefits (i) are

---

[237] *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, at *15 (Del. Ch. Feb. 17, 2022) (quoting *In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *66 (Del. Ch. May 6, 2021)).

[238] *New Enter. Assocs. 14, L.P. v. Rich* (*NEA*), 292 A.3d 112, 161 & n.34 (Del. Ch. 2023) (collecting cases).

[239] *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993), *overruled in part on other grounds by United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034 (Del. 2021).

[240] Compl. ¶ 228.

[241] *See Goldstein*, 2022 WL 1671006, at *42–43 (collecting cases finding severance payments created an interest under *Cornerstone*).

paid out pursuant to a pre-existing agreement, and (ii) there is no allegation that those benefits were triggered by the specific bidder or specific transaction.[242] Both decisions relied on cases that did not assert that proposition as a matter of law, but rather determined on the facts presented, either when denying a motion for preliminary injunction or when granting a motion for summary judgment, that a specific change-in-control payment did not give rise to a disabling interest for a specific defendant.[243]

---

[242] *Morrison v. Berry*, 2019 WL 7369431, at *22 (Del. Ch. Dec. 31, 2019) (holding that complaint failed to support a reasonable inference that general counsel's change-in-control benefits created a conflict because "[g]enerally, change-in-control benefits arising out of a pre-existing employment contract do not create a conflict, and nothing in the alleged facts suggests [the general counsel]'s single-trigger bonus was unique or specially negotiated in anticipation of the Apollo transaction" (footnote omitted)); *In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *11 (Del. Ch. Jan. 3, 2013) ("[T]he possibility of receiving change-in-control benefits pursuant to pre-existing employment agreements does not create a disqualifying interest as a matter of law.").

[243] *See In re Smurfit–Stone Container Corp. S'holder Litig.*, 2011 WL 2028076, at *22 (Del. Ch. May 24, 2011) (declining to enjoin merger; noting that plaintiffs argued that certain members of target management, who acted as negotiators, would receive change-in-control bonuses; and finding that plaintiffs "have not shown that the executives involved acted on their conflicts at Smurfit–Stone's expense or that the Committee impermissibly permitted them to do so"); *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *12 (Del. Ch. May 22, 2000) (granting summary judgment in favor of defendants and holding CEO's accelerated vesting of stock options and a $4.5 million cash severance payment did not create an economic conflict of interest for the CEO, who would retire in connection with the merger, where (i) "the severance payment and the accelerated vesting schedule [were] legitimate contractual benefits emanating from a 1994 employment agreement," (ii) "they were the subject of arm's length bargaining and mutual consideration," and (iii) at the time of the merger, the CEO "owned equity in both companies, [and] his interest in [the sell-side entity] significantly outweighed his interest in [the buyer]"); *Nebenzahl v. Miller*, 1993 WL 488284, at *3 (Del. Ch. Nov. 8, 1993) (declining to grant preliminary injunction and finding no reasonable probability that a breach of duty of loyalty occurred where the

The two cases go a step too far by converting fact-specific holdings into a rule of law. A fiduciary is interested in a transaction when the fiduciary receives something different than stockholders as a whole and when that something is material to the fiduciary.[244] The fact that the individual receives the payment or other differential interest because of an existing agreement does not change the fact that the individual receives the payment or other differential interest. If a fiduciary is choosing between two deals, one that will cause the fiduciary to receive $11 million personally and the other that will not, the fiduciary has an interest in the first deal. That interest exists regardless of whether the $11 million is provided as part of the deal or under a pre-existing contract.

It is possible to imagine scenarios where a defendant might contend successfully on the facts of a given case that a change-in-control benefit did not give rise to a conflict for purposes of a particular decision. If a defendant faced a choice between two deals, both of which would cause the defendant to receive the same benefit, then *as to the decision between those two deals*, the defendant would not have a conflict. But as to other alternatives that would not trigger the payment, the fiduciary has a conflict.

merger agreement guaranteed change-in-control benefits under pre-existing employment agreements to four inside directors on an eight-member board).

[244] *See, e.g., Rales*, 634 A.2d at 936; *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *30 (Del. Ch. Apr. 14, 2017); *Trados I*, 2009 WL 2225958, at *6.

It is also true that on the facts of a given case, the evidence may show that a change-in-control payment did not give rise to a conflict or that the fiduciary in question did not succumb to it. It does not follow that the receipt of a pre-existing contractual benefit, solely by virtue of being a pre-existing contractual benefit, cannot create a conflict as a matter of law. The change-in-control benefits that Bennett received constituted a benefit not shared with the Company's other stockholders and were sufficiently large to be material. They constituted a compromising interest.

Finally, it is reasonably conceivable that Bennett acted to advance his own interests by tipping Vista about the sale process without telling the Board or the Committee. As a director, Bennett "had an unremitting obligation to deal candidly with [his] fellow directors."[245] "To satisfy his duty of loyalty, and its subsidiary requirement that he act in good faith, he needed to be candid with . . . his fellow board

---

[245] *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 119 (Del. Ch. 1999) (internal quotation marks omitted); *see Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283 (Del. 1989) ("As the duty of candor is one of the elementary principles of fair dealing, Delaware law imposes this unremitting obligation not only on officers and directors, but also upon those who are privy to material information obtained in the course of representing corporate interests."); *Thorpe v. CERBCO*, 676 A.2d 436, 441–42 (Del. 1996) (stressing the importance of duty to be candid with fellow directors); *Int'l Equity Cap. Growth Fund, L.P. v. Clegg*, 1997 WL 208955, at *7 (Del. Ch. Apr. 22, 1997) (noting that directors owe a "duty to disclose to other directors"); Am. L. Inst., *Principles of Corporate Governance: Analysis and Recommendations* § 5.02(a)(1) cmt. (1994), Westlaw (database updated Oct. 2024) ("A director or senior executive owes a duty to the corporation not only to avoid misleading it by misstatements or omissions, but affirmatively to disclose the material facts known to the director or senior executive.").

members."[246] Bennett inferably brought Vista into the process because Vista was likely to make a control bid that would trigger Bennett's change-of-control benefits. By failing to disclose his actions to the Board or the Committee, Bennett inferably acted in bad faith.

Viewed as a whole, the pleading-stage record supports an inference that Bennett could have acted disloyally or in bad faith by catering to the wishes of General Atlantic. He is not entitled to dismissal at this stage of the case.

## C. The Claims For Aiding And Abetting

Vista and Goldman contend that the Complaint fails to plead a claim against them for aiding and abetting. The Complaint states an aiding and abetting claim against Goldman, but not against Vista.

A claim for aiding and abetting has four elements: (1) the existence of a fiduciary relationship, (2) a breach of fiduciary duty, (3) knowing participation in that breach, and (4) damages proximately caused by the breach.[247] "[A] claim for aiding and abetting often turns on meeting the 'knowing participation' element."[248] The

---

[246] *Crescent/Mach I P'ship, L.P. v. Turner*, 2007 WL 1342263, at *3 (Del. Ch. May 2, 2007). *See generally* J. Travis Laster & John Mark Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, 70 Bus. Law. 33, 45 (2015) (explaining that a director's failure "to provide information regarding the corporation to the board . . . may constitute a breach of fiduciary duty on the part of the . . . director[] responsible for the failure").

[247] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

[248] *Buttonwood Tree Value P'rs, L.P. v. R. L. Polk & Co., Inc.*, 2017 WL 3172722, at *9 (Del. Ch. July 24, 2017).

"knowing participation" element "involves two concepts: knowledge and participation."[249]

The knowledge concept itself has two dimensions.[250] First, the secondary actor must know that the primary wrongdoer's conduct constituted a breach.[251] Second, the secondary actor must know that its own participation in the wrongful conduct was legally improper.[252] The secondary actor's conduct need not be wrongful or tortious in its own right, but the secondary actor must know that it was acting wrongfully by participating.[253]

"Because the involvement of secondary actors in tortious conduct can take a variety of forms that can differ vastly in their magnitude, effect, and consequential culpability," the participation concept "requires that the secondary actor have

_____

[249] *Presidio*, 251 A.3d at 275.

[250] *RBC Cap. Mkts.*, 129 A.3d at 861–62.

[251] *Id.*; *accord Malpiede*, 780 A.2d at 1097 ("Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach.").

[252] *RBC Cap. Mkts.*, 129 A.3d at 862.

[253] *NEA*, 292 A.3d at 176 ("The aider and abettor must knowingly assist another in committing a wrongful act. The means by which an aider and abettor provides assistance need not be independently wrongful."); *e.g.*, *Found. Bldg. Materials*, 318 A.3d at 1171 ("The plaintiff has not pled that RBC took action that was independently wrongful, but that is not required. . . . RBC worked closely with the Lone Star-affiliated directors to secure proposals that included a maximum Early Termination Payment. RBC played an integral part in the effort to sell the Company through a transaction that would trigger the Early Termination Payment. The complaint states a claim against RBC for aiding and abetting that alleged breach.").

provided 'substantial assistance' to the primary violator."[254] To assess substantial assistance, Delaware law applies a five-factor test derived from Section 876 of the *Restatement (Second) of Torts*. That framework calls for considering (1) the nature of the act encouraged, (2) the amount of assistance given by the defendant, (3) his presence or absence at the time of the tort, (4) his relation to the other, and (5) his state of mind.[255]

In two recent decisions, the Delaware Supreme Court made the knowing participation element tougher, both for knowledge and participation. Under *RBC Capital*, constructive knowledge was enough to satisfy the knowledge requirement.[256] That meant the secondary actor had to act "knowingly, intentionally, or with reckless indifference."[257] In *Columbia Pipeline*, the justices overruled that aspect of *RBC Capital* by holding that the aider and abettor's knowledge "must be actual knowledge."[258]

---

[254] *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *41 (Del. Ch. Aug. 27, 2015).

[255] *Id.* at *42; *accord In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349, 395–96 (Del. 2024).

[256] *RBC Cap. Mkts.*, 129 A.3d at 862 ("To establish *scienter*, the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper." (internal quotation marks omitted)).

[257] *Id.* (internal quotation marks omitted).

[258] *In re Columbia Pipeline Gp., Inc. Merger Litig.*, 342 A.3d 324, 368 (Del. 2025).

In *Mindbody* and *Columbia Pipeline*, the justices tightened the participation concept, this time by narrowing what can qualify as "substantial assistance." For purposes of the second *Restatement* factor, the justices held that a conscious failure to act in the face of a known duty to act did not qualify as substantial assistance, reasoning that it constituted mere passive inaction rather than affirmative conduct.

*Mindbody* involved an acquirer who agreed in a merger agreement to supply accurate information for inclusion in the target corporation's proxy statement and to correct any material misstatements or omissions the acquirer identified.[259] When addressing the second *Restatement* factor—the amount of assistance given by the defendant—the justices viewed the record differently than the trial court. According to the Delaware Supreme Court, the acquirer's decision to remain silent in the face of its contractual duty, despite knowing of material misstatements and omissions in the proxy statement, merely constituted "passive awareness" of the disclosure

---

[259] *See Mindbody*, 332 A.3d at 375 (describing contractual obligations); *id.* at 380 ("According to the trial court, Vista aided and abetted Stollmeyer's disclosure breach by failing to correct the Proxy [Statement] Materials to include a full and fair description of its own interactions with Stollmeyer. In reaching this conclusion, the trial court relied on Vista's contractual obligation to review the Proxy [Statement] Materials and notify Mindbody if there were any material omissions. The trial court found that Vista personnel reviewed the Proxy [Statement] Materials, knew about Vista's interactions that were omitted and the significance of those omissions, and failed to speak up."); *id.* at 389 ("The trial court held that Vista's 'contractual obligation' in the merger agreement to review Mindbody's proxy statements and 'correct' any misstatements or omissions, and Vista's subsequent failure to correct omissions, amounted to 'knowing participation' in Stollmeyer's breach of his duty of disclosure.").

violation rather than active participation in its commission.[260] The justices also weighed the evidence differently when assessing the acquirer's state of mind. Despite agreeing with the trial court that the evidence showed the acquirer "had at least some awareness that its own actions during the sale process were not above suspicion," the senior tribunal found that the evidence "does not adequately support a finding of *scienter* and aiding and abetting liability for the proxy disclosure violations."[261] The Delaware Supreme Court also relied heavily on the arms' length nature of the relationship between an acquirer and the target.[262]

---

[260] *Id.* at 390 ("We hold that the Merger Agreement's contractual provision did not transform Vista's inaction into a 'knowing participation' in Stollmeyer's disclosure breach."); *see id.* at 393–94.

[261] *Id.* at 405; *see id.* at 406 ("The trial court may well be correct that Vista hid such details because they did not reflect well on Vista. Vista may have been aware that some of its conduct during the sale process was not above suspicion. But the knowledge that matters for the second prong of scienter is knowledge that the aider and abettor's (Vista's) own conduct wrongfully assisted the primary violator (Stollmeyer) in his disclosure breach, not his sale-process *Revlon* breach. The trial court made no finding that indicated that Vista knew that its failure to abide by its contractual duty to notify Mindbody of potential material omissions in the Proxy [Statement] Materials was wrongful and that its failure to act could subject it to liability to Mindbody's stockholders.").

[262] *Id.* at 404. As part of its analysis, the Delaware Supreme Court stated: "Finally, there are also compelling public policy reasons not to read contractual disclosure-based obligations between a third-party buyer and a target company as implying independent fiduciary duties between the third-party buyer and the target's stockholders. Such a duty would collapse the arms'-length distance between the third-party buyer and the target, forcing the buyer to consider its duty to the target's stockholders instead of to its own stockholders." *Id.* Yet as the high court recognized in the preceding paragraph of its decision, no one asserted a claim for breach of fiduciary duty against the acquirer, and no one argued that the contractual obligation created a fiduciary obligation. *Id.* The only claim was for aiding and abetting. For the trial court, the contractual obligation provided the basis for interpreting conscious

The justices followed the same reasoning in *Columbia Pipeline*, where a parallel contractual duty existed, the acquirer knew about material misstatements and omissions, and the counterparty decided to remain silent.[263] The Delaware Supreme Court accepted that the acquirer "offered comments on the Proxy [Statement]," but stressed that the acquirer "did not propose any of the statements that the Court of Chancery found to be misleading" and did not "suggest omitting material information."[264] The justices also reasoned that the sell-side fiduciaries knew everything the acquirer knew "with one exception."[265] The exception did not carry the day, because on that factual point the justices made a different finding than the trial court.[266]

In holding that a conscious failure to comply with a known duty to act did not constitute meaningful assistance, the justices made two moves. First, they reasoned that a conscious failure to act could only be significant if the duty to act ran to the injured party, rather than to the primary wrongdoer. According to the Delaware

---

inaction as substantial participation. No more than that. *See Mindbody*, 2023 WL 2518149, at *44 ("Vista had an obligation to correct the material omissions discussed above and failed to do so. Vista thus withheld information from the stockholders.").

[263] *Columbia Pipeline*, 342 A.3d at 368.

[264] *Id.* at 371.

[265] *Id.*

[266] *Id.*

Supreme Court, "without a third party's independent duty to a plaintiff, there can be no liability for a failure to act."[267] But if the alleged aider and abettor already owes a duty to the plaintiff, and the aider and abettor failed to act in the face of it, then the aider and abettor becomes a primary wrongdoer, and the aiding and abetting claim is superfluous. The Delaware Supreme Court supported that interpretation by citing authorities recognizing that violating a duty to the injured party is sufficient for knowing participation.[268] Those authorities did not hold that a duty to the injured party was *necessary*, nor did they rule out the possibility that failing to act in the face of a duty to the primary wrongdoer could be sufficient.[269]

The justices' other move was to treat conscious inaction as lacking an active component. By taking that approach, *Mindbody* and *Columbia Pipeline* cut against the legal grain. When assessing fraud, Delaware law treats silence in the face of a duty to speak as the equivalent of an affirmative misstatement.[270] When determining

---

[267] *Mindbody,* 332 A.3d at 394 (citing *Patton v. Simone*, 1992 WL 183064, at *9–11 (Del. Super. June 25, 1992)).

[268] *See id.* (quoting Restatement (Second) of Torts § 876(c) (Am. L. Inst. 1979), and citing *Patton*, 1992 WL 183064, at *9–11).

[269] *See, e.g.*, *Metge v. Baehler*, 762 F.2d 621, 624–25 (8th Cir. 1985) ("Although courts are by no means unanimous in treating the question of substantial assistance in a case of inaction, most seem to agree that, if the aider and abettor owes the plaintiff an independent duty to act or to disclose, inaction can be a proper basis for liability under the substantial assistance test.").

[270] *Wildenberg v. Sign-Zone Hldgs. L.P.*, 2025 WL 2945823, at *2 (Del. Oct. 17, 2025) (TABLE) ("Delaware law recognizes that fraud may arise not only from affirmative misrepresentations but also from silence in the face of a duty to speak or from omission of material facts."); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069,

whether a fiduciary has acted in bad faith, Delaware law regards a "conscious disregard for one's responsibilities" as the equivalent of bad faith conduct.[271] More generally, Delaware courts regularly treat a conscious decision not to act as the equivalent of action.[272]

Moreover, by treating conscious inaction in the face of a known duty to act as insufficient to support a finding of substantial assistance, *Mindbody* and *Columbia Pipeline* seemingly overruled *RBC Capital* a second time. In the earlier decision, the

1074 (Del. 1983) ("[F]raud does not consist merely of overt misrepresentations. It may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak.").

[271] *Disney*, 906 A.2d at 66–67; *accord Lyondell Chem.*, 970 A.2d at 240.

[272] *See, e.g.*, *Aronson*, 473 A.2d at 813 ("[A] conscious decision to refrain from acting may nonetheless be a valid exercise of business judgment and enjoy the protections of the rule."); *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 183 (Del. Ch. 2014) ("The Complaint alleges that the Board had the ability to defer interest payments on the Junior Notes, that the Junior Notes would not receive anything in an orderly liquidation, that [Defendant] owned all of the Junior Notes, and that the Board decided not to defer paying interest on the Junior Notes to benefit [Defendant]. . . . A decision to act and a conscious decision not to act are . . . equally subject to review under traditional fiduciary duty principles."); *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *23 (Del. Ch. May 21, 2013) ("The Special Committee decided not to take any action with respect to the Audit Committee's termination of two successive outside auditors and the allegations made by Ernst & Young. The conscious decision not to take action was itself a decision."); *Krieger v. Wesco Fin. Corp.*, 30 A.3d 54, 58 (Del. Ch. 2011) ("Wesco stockholders had a choice: they could make an election and select a form of consideration, or they could choose not to make an election and accept the default cash consideration."); *Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *10 (Del. Ch. Jan. 14, 1991) ("[T]he case-by-case development of the law governing fiduciary obligations . . . cannot be constrained by so facile a distinction. From a semantic and even legal viewpoint, 'inaction' and 'action' may be substantive equivalents, different only in form.").

Delaware Supreme Court held that a sell-side financial advisor (RBC) aided and abetted a board of directors in breaching its duty of disclosure.[273] The case against RBC involved two disclosure breaches, one where RBC provided false information, the other in which RBC remained silent.

The first disclosure breach arose because RBC provided the directors with a valuation presentation that contained a misrepresentation. In the presentation, RBC stated that it used "Wall Street research analyst consensus projections" to derive EBITDA.[274] In fact, the "'consensus projections' were neither analyst projections, nor did they represent a Wall Street consensus."[275] The directors included a summary of the presentation in the company's proxy statement, repeating the falsehood. For purposes of the distinction that *Mindbody* and *Columbia Pipeline* drew between active and passive conduct, providing false information would seem to fall on the active side of the line.

The second disclosure violation arose because RBC failed to inform the directors about actions it took during the sale process, including last minute efforts to provide the buyer with staple financing. The trial court decision described the situation as follows:

> The Proxy Statement stated that RBC received the right to offer staple financing because it "could provide a source for financing on terms that

---

[273] *See RBC Cap. Mkts.*, 129 A.3d at 863, 865–66.

[274] *Id.* at 859.

[275] *Id.*

might not otherwise be available to potential buyers of the Company. . . ." JX 611 at 29. This statement was false. The Board never concluded that RBC could provide financing that might otherwise not be available, and no evidence to that effect was introduced at trial. In December 2010, RBC told the Special Committee that the credit markets were open and receptive to acquisition financing, and they remained so for the duration of the sale process.

Equally important, this partial disclosure imposed on the Rural directors a duty to speak completely on the subject of RBC's financing efforts. . . . The Proxy Statement does not describe how RBC used the initiation of the Rural sale process to seek a role in the EMS acquisition financing, and it does not disclose RBC's receipt of more than $10 million for its part in financing the acquisition of EMS. The Proxy Statement says nothing about RBC's lobbying of Warburg after the delivery of Warburg's fully financed bid, while RBC was developing its fairness opinion. Munoz reviewed the Proxy Statement, but he did not look to see if these matters were addressed.

A stockholder reading the Proxy Statement would conclude, incorrectly, that RBC disclosed all of its conflicts and led a pristine process.[276]

Because the directors failed to disclose information that RBC had withheld, they breached their duty of disclosure.

At the trial level in *RBC Capital,* the lower court treated RBC's knowing failure to provide the information as sufficient to establish substantial assistance. The trial court decision stated: "Only RBC knew the full extent of its conflicts, including its successful plan to use the Rural sale process to gain a place on the financing trees of the bidders for EMS and its late-stage push for a buy-side financing role from

---

[276] *In re Rural Metro Corp.*, 88 A.3d 54, 106 (Del. Ch. 2014) (subsequent history omitted).

Warburg . . . ."[277] On appeal, the Delaware Supreme Court reasoned similarly, stating: "RBC's failure to fully disclose its conflicts and ulterior motives to the Board, in turn, led to a lack of disclosure in the Proxy Statement."[278] Underscoring the conclusion that RBC's knowing failure to supply the information was itself sufficient, the justices concluded that "[p]ropelled by its own improper motives, RBC misled the Rural directors into breaching their duty of care, thereby aiding and abetting the Board's breach of its fiduciary obligations."[279] Contrary to *Mindbody* and *Columbia Pipeline*, *RBC Capital* treated the knowing failure to disclose material information as sufficient participation, standing alone, to support the aiding and abetting claim.[280] In this section of *RBC Capital*, the decision did not discuss the need for a predicate duty.

Elsewhere in the decision, however, the Delaware Supreme Court seemingly recognized a duty running from RBC to the company, personified by its board. One of the issues in *RBC Capital* involved the effect of director exculpation on aiding and abetting liability. When discussing that issue, the trial court had explained that

---

[277] *Id.* at 107.

[278] *RBC Cap. Mkts.*, 129 A.3d at 863.

[279] *Id.*

[280] *Id.* ("The manifest intentionality of RBC's conduct—as evidenced by the bankers' own internal communications—is demonstrative of the advisor's knowledge of the reality that the Board was proceeding on the basis of fragmentary and misleading information.").

directors and their advisors are differently situated, describing the latter as gatekeepers.[281] After an industry uproar, the Delaware Supreme Court took pains to distance itself from "the Court of Chancery's description of the role of a financial advisor in M & A transactions."[282] According to the Delaware Supreme Court, the gatekeeper concept

> does not adequately take into account the fact that the role of a financial advisor is primarily contractual in nature, is typically negotiated between sophisticated parties, and can vary based upon a myriad of factors. Rational and sophisticated parties dealing at arm's-length shape their own contractual arrangements and it is for the board, in managing the business and affairs of the corporation, to determine what services, and on what terms, it will hire a financial advisor to perform in assisting the board in carrying out its oversight function.[283]

Yet the justices went on to state that "[t]he banker is under an obligation not to act in a manner that is contrary to the interests of the board of directors, thereby undermining the very advice that it knows the directors will be relying upon in their decision making processes."[284] *RBC Capital* did not identify the source of that duty,

---

[281] *Rural Metro*, 88 A.3d at 88. Among other authorities, the decision relied on Professor John Coffee's recognition that "[o]bvious examples of gatekeepers . . . would include . . . the investment baker providing its 'fairness opinion' as to the pricing of a merger." John C. Coffee, Jr., *Gatekeeper Failure and Reform: The Challenge of Fashioning Relevant Reforms*, 84 B.U. L. Rev. 301, 309 (2004).

[282] *RBC Cap. Mkts.*, 129 A.3d at 865 n.191.

[283] *Id.*

[284] *Id.*

which might derive from agency law[285] or from the implied covenant of good faith and

fair dealing inherent in every contract and hence in the banker's engagement

letter.[286]

---

[285] Restatement (Third) of Agency § 8.11 cmt. b (Am. L. Inst. 2006), Westlaw (database updated Oct. 2024) ("An agent owes the principal a duty to provide information to the principal that the agent knows or has reason to know the principal would wish to have."). It is easy to conceive of a financial advisor acting as the corporation's agent for purposes of its engagement. *In re Shoe-Town, Inc. S'holders Litig.*, 1990 WL 13475, at *7 (Del. Ch. Feb. 12, 1990) ("Shearson, in the present situation, was hired by management to work for and answer to management. . . . In effect, Shearson served as an agent of management. Its authority was derived by delegation from management."); *see* Andrew F. Tuch, *Banker Loyalty in Mergers and Acquisitions*, 94 Tex. L. Rev. 1079, 1085–112 (2016) (arguing in favor of treating investment bankers as fiduciaries for their clients). Authorities from other jurisdictions suggest the existence of a fiduciary relationship, likely grounded in agency law, between financial advisor and client. *See, e.g.*, *In re Daisy Sys. Corp.*, 97 F.3d 1171, 1178–79 (9th Cir. 1996) (rejecting an M&A advisor's claim that "the relationship between an investment banker and the banker's [corporate] client is not a fiduciary relationship as a matter of law," treating that relationship as depending on the facts and circumstances at issue, and finding that a fiduciary relationship may have existed between the M&A advisor and its client); *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 102 (S.D.N.Y. 2004) (stating that the relationship between an M&A advisor and its corporate client may be fiduciary even where no formal agency relationship exists, observing that New York courts have found such relationships to be fiduciary, and finding that the M&A advisor in question "owed a fiduciary duty to [its corporate client] in its capacities as investment banker and financial advisor"); *Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 2002 WL 362794, at *9 (S.D.N.Y. Mar. 6, 2002) (finding sufficient facts to support the existence of a fiduciary relationship between an M&A advisor and its corporate client); *Gen. Acquisition, Inc. v. GenCorp Inc.*, 766 F. Supp. 1460, 1473 (S.D. Ohio 1990) (finding sufficient facts to show that an M&A advisor was an agent of its corporate client with respect to a proposed acquisition and to support the imposition of a de facto fiduciary duty on the M&A advisor for the benefit of that client); *Frydman & Co. v. Credit Suisse First Bos. Corp.*, 708 N.Y.S.2d 77, 79 (App. Div. 2000) (reversing dismissal of breach of fiduciary duty claim by a corporate client against its M&A advisor). Financial advisors, of course, disclaim agency status and strive to establish their status as independent contractors, but that baseline issue is not contractible. Restatement (Third) of Agency, *supra*, § 1.02 ("An agency relationship arises only when the elements stated in § 1.01 are present. Whether a

The existence of an "obligation not to act in a manner that is contrary to the interests of the board of directors, thereby undermining the very advice that it knows the directors will be relying upon in their decision making processes"[287] could encompass a duty to provide material information. That would make the facts of *RBC Capital* parallel the facts of *Mindbody* and *Columbia Pipeline*, because the financial advisor's duty to supply information would look a lot like the contractual obligation to identify materially misleading disclosures or omissions that *Mindbody* and

_____

relationship is characterized as agency in an agreement between parties . . . is not controlling."). A principal can authorize an agent to engage in specific types of conduct that otherwise might breach the agent's duties, but the parties cannot determine by contract whether or not the fiduciary relationship exists. *See id.* § 8.06(1)(b); *see* Andrew F. Tuch, *Disclaiming Loyalty: M&A Advisors and Their Engagement Letters: In response to William W. Bratton & Michael L. Wachter, Bankers and Chancellors*, 93 Tex. L. Rev. 211, 217 (2015); *see also, e.g.*, *Ha-Lo Indus., Inc. v. Credit Suisse First Bos., Corp.*, 2005 WL 2592495, at *5–6 (N.D. Ill. Oct. 12, 2005) (denying a motion for summary judgment that argued that a clause in an engagement letter disclaiming a fiduciary duty between a bank and its M&A client prevented the bank from owing fiduciary duties to its client).

[286] *See Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1116–24 (Del. 2022). In *Baldwin*, the Delaware Supreme Court treated the concept of bad faith under the implied covenant as synonymous with bad intent. As support, *Baldwin* cited *Desert Equities*, where the Delaware Supreme Court referred to bad faith under the implied covenant as a "state of mind" involving "the conscious doing of a wrong because of dishonest purpose or moral obliquity." *See id.* at 1118 nn.110 & 111 (citing *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 & n.16 (Del. 1993)). *Baldwin* also cited *Amirsaleh*, where this court stated a party could establish a breach of the implied covenant by showing that "the exercise of discretion was done in bad faith (i.e., that it was motivated by an improper purpose or done with a culpable mental state)." *See id.* (citing *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 2009 WL 3756700, at *5 (Del. Ch. Nov. 9, 2009)). After *Baldwin*, bad intent can breach the implied covenant.

[287] *RBC Cap. Mkts.*, 129 A.3d at 865 n.191.

*Columbia Pipeline* rejected as insufficient. But in *RBC Capital*, the Delaware Supreme Court implicitly treated silence in the face of that obligation as substantial participation.

There is a passage in *RBC Capital* that suggests the financial advisor owed a duty to the stockholders, but the language is brief and elliptical. It states:

> When parties to a transaction *and their advisors* travel down the road of partial disclosure they have an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events. The Proxy Statement failed to disclose how RBC used the Rural sale process to seek a financing role in the EMS transaction. Nor did it disclose RBC's courtship of Warburg. When viewed in conjunction with the potential fees RBC was to receive for its financing services, the investment bank's pursuit of Warburg's financing business was demonstrative of a conflict that was unquestionably material, and necessitated full and fair disclosure for the benefit of the stockholders.[288]

Read broadly, this passage says that where partial disclosures are concerned, "parties to a transaction *and their advisors* . . . have an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events."[289] A duty of disclosure to stockholders would satisfy the *Mindbody* and *Columbia Pipeline* framing, but *RBC Capital* would stand alone in recognizing it.[290]

---

[288] *Id.* at 860–61 (cleaned up) (emphasis added).

[289] *Id.* at 860 (cleaned up) (emphasis added).

[290] *Compare Shoe-Town*, 1990 WL 13475, at *7 (holding that investment banker retained by management did not owe any duty of disclosure to stockholders). The court distinguished a New York decision that recognized such a duty, characterizing the case as "factually distinguishable, however, because the investment advisor in that case was hired by a special committee charged solely with determining the fairness of the transaction for the shareholders" while the financial

*Mindbody* and *Columbia Pipeline* do not provide much help in reconciling the different approaches. In *Mindbody*, the Delaware Supreme Court characterized *RBC Capital* as involving "aiding and abetting liability for a financial advisor who

---

advisor whose conduct was at issue "was hired by management to work for and answer to management." *Id.*

Under the heading of roads not taken, the *Weinberger* litigation originally focused on the alleged inadequacies of Lehman Brothers' performance when advising the directors of UOP, Inc. In the post-trial decision entering judgment for the defendants, then-Vice Chancellor Brown observed that "plaintiff has offered no authority to indicate that an investment banking firm rendering a fairness opinion as to the terms of a merger owes the same fiduciary duty to the minority shareholders as does the majority." *Weinberger v. UOP, Inc.*, 426 A.2d 1333, 1348 (Del. Ch. 1981) (subsequent history omitted). On appeal, the Delaware Supreme Court initially issued a 2-to-1 decision affirming that outcome. *Weinberger v. UOP, Inc.*, No. 58, 1981 (Del. Feb. 9, 1982) (subsequent history omitted). Justices Quillen and McNeilly did not "find it fruitful in the present context to characterize the relationship between Lehman Brothers and UOP, and the UOP minority, as anything but contractual." *Id.* at 3. They nevertheless concluded that "[t]he contract obviously created a duty, including a duty to the minority," although there was "no basis for liability in the present record." *Id.* Writing in dissent, Justice Duffy viewed the case as presenting "important issues involving the responsibility of an investment banking firm, in the context of a corporate merger." *Id.* at 6 (Duffy, J., dissenting). He would have held that by giving a fairness opinion, "knowing that it will be used to help persuade minority public stockholders," Lehman Brothers took on "a duty to exercise reasonable care or competence in obtaining or communicating the information as to the value of the UOP shares" and that "any failure to perform in accordance with that standard would make Lehman Brothers liable to the public stockholders for negligent misrepresentation under the circumstances stated in *Restatement of the Law, Torts 2d* § 552." *Id.* at 7–8 (Duffy, J., dissenting). The justices thus unanimously regarded Lehman Brothers as owing a duty to the public stockholders in that setting, although they disagreed on the source. The Delaware Supreme Court granted the plaintiff's motion for reargument and vacated the decision. *Weinberger v. UOP, Inc.*, No. 58, 1981 (Del. Mar. 16, 1982). The plaintiff dismissed Lehman Brothers, and the questions about investment banker liability dropped out of the case. Nearly a year later, the Delaware Supreme Court issued the landmark decision we know today, which while critical of Lehman Brothers' performance, does not comment on the firm's obligations or potential liability. *See Weinberger*, 457 A.2d 701.

'purposely misled the [seller's] Board so as to proximately cause the Board to breach its duty of care.'"[291] That fairly describes much of what happened in *RBC Capital*, but not the most apposite aspect of the case. The justices also described *RBC Capital* as a situation where RBC "knew all of the relevant information and the board knew none of it."[292] Fair, but that does not address the question of duty.

One possibility is that *Mindbody* and *Columbia Pipeline* overruled *RBC Capital* both on the actual knowledge requirement and on what type of involvement can constitute substantial participation. But decisions should be harmonized if possible, and a more likely possibility is that the different approaches reflect the application of the *Restatement* factors as a whole. *RBC Capital* did not address the *Restatement* factors; Delaware decisions began using those factors after *RBC Capital* to calm practitioner concern that any involvement in a transaction might support an

---

[291] *Mindbody*, 332 A.3d at 393 (quoting *RBC Cap. Mkts.*, 129 A.3d at 865). *Mindbody* later returned to *RBC Capital* and again depicted that case as a scenario where the board was "misled and 'intentionally duped' by RBC." *Id.* at 401 (quoting *RBC Cap. Mkts.*, 129 A.3d at 863, 865–66). True, but part of the duping was through a failure to disclose.

[292] *Id.* at 401. Rather than engaging with the aspect of *RBC Capital* involving a failure to disclose, *Mindbody* observed that in *Buttonwood*, "the Court of Chancery held that a financial advisor was not liable for 'passive awareness . . . of the omission of material facts in disclosures to the stockholders, made by fiduciaries *who themselves were aware of the information*.'" *Id.* at 393 (quoting *Buttonwood*, 2017 WL 3172722, at *10) (emphasis in original). *Buttonwood* thus involved two independent factors that each potentially distinguished it from a third-party acquirer under a contractual duty to speak: (i) no identifiable duty, and (ii) knowledge that the fiduciaries already had the information.

aiding and abetting claim.[293] When considering all of the factors, aiding and abetting might well exist for a sell-side financial advisor under circumstances where it could not exist for a third-party acquirer.[294]

*Mindbody* and *Columbia Pipeline* were also post-trial decisions. At the pleading stage, a complaint must contain factual allegations supporting a reasonable inference that the aider and abettor actually knew that the primary violator's conduct was a fiduciary breach, actually knew that its own conduct was legally improper (even if not inherently illegal), and actively participated in the primary violator's misconduct. For purposes of a motion to dismiss under Rule 12(b)(6), a complaint need only plead facts supporting a reasonable inference of knowledge.[295] Under Rule 9(b), a plaintiff can plead knowledge generally; "there is no requirement that knowing participation be pled with particularity."[296] To plead participation, a plaintiff can plead that the advisor "participated in the board's decisions, conspired with [the]

---

[293] The trial court decision in *RBC Capital* cited the *Restatement* but did not discuss or apply the factors. *See In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 220 n.1 (Del. Ch. 2014). The following year, the *Dole* decision delved into the factors as a framework for analyzing knowing participation. *See Dole*, 2015 WL 5052214, at *41.

[294] *Elec. Last Mile Sols., Inc. S'holder Litig.*, 2026 WL 207195, at *7–10 (Del. Ch. Jan. 27, 2026).

[295] *See Dent*, 2014 WL 2931180, at *17.

[296] *Id.*

board, or otherwise caused the board to make the decisions at issue."[297] But "'[c]onclusory statements that are devoid of factual details to support an allegation of knowing participation will fall short of the pleading requirement needed to survive a Rule 12(b)(6) motion to dismiss.'"[298] To state the obvious, a claim for aiding and abetting might survive pleading-stage review, yet fail after trial.

### 1. Goldman

The plaintiffs allege that Goldman aided and abetted the fiduciary defendants both in breaching their duties during the transaction process and in breaching their duty of disclosure for purposes of the Proxy Statement. The Complaint states a claim against Goldman under the first heading. Given the uncertainty about harmonizing *RBC Capital* with *Mindbody* and *Columbia Pipeline*, the court defers ruling on that issue under Rule 12(i).[299]

### a. Aiding And Abetting During The Transaction Process

Claims that a party aided and abetted breaches of duty during a transaction process are not one-size-fits-all affairs. The *Restatement* factors recognize that reality by taking into account (1) the nature of the act encouraged, (2) the amount of

---

[297] *Malpiede*, 780 A.2d at 1098.

[298] *Jacobs v. Meghji*, 2020 WL 5951410, at *7 (Del. Ch. Oct. 8, 2020) (quoting *McGowan v. Ferro*, 2002 WL 77712, at *2 (Del. Ch. Jan. 11, 2002)).

[299] *See* Ct. Ch. R. 12(i).

assistance given by the defendant, (3) his presence or absence at the time of the tort, (4) his relation to the other, and (5) his state of mind.[300]

A good place to start is factor four: the relation between the aider and abettor and the primary wrongdoer. "When a plaintiff alleges that a third-party acquirer knowingly participated in a breach of fiduciary duty by sell-side directors, Delaware law imposes an appropriately high pleading burden because an acquirer is expected to bargain in its own interest."[301] "A plaintiff must plead meaningful facts to support an inference that the acquirer attempted to create or exploit conflicts of interest on the board or otherwise conspired with the directors to engage in a fiduciary breach."[302] But as *RBC Capital* suggests, financial advisors are different. A third-

---

[300] *Dole*, 2015 WL 5052214, at *42; *accord Mindbody*, 332 A.3d at 395–96.

[301] *NEA*, 292 A.3d at 175; *see, e.g.*, *In re Rouse Props., Inc., Fiduciary Litig.*, 2018 WL 1226015, at *25 (Del. Ch. Mar. 9, 2018) (explaining that the buyer was "entitled to negotiate the terms of the Merger with only its interests in mind; it was under no duty or obligation to negotiate terms that benefited [the seller] or otherwise to facilitate a superior transaction for [the seller]").

[302] *NEA*, 292 A.3d at 175; *see Malpiede*, 780 A.2d at 1097–98; *Del Monte Foods*, 25 A.3d at 837. One Delaware Supreme Court decision suggests that Delaware law has sought to create a special and highly protective standard for financial advisor liability in general, stating: "Delaware has provided advisors with a high degree of insulation from liability by employing a defendant-friendly standard that requires plaintiffs to prove scienter and awards advisors an effective immunity from due-care liability. . . . [M]ost professionals face liability under a standard involving mere negligence, not the second highest state of scienter—knowledge—in the model penal code." *Singh v. Attenborough*, 137 A.3d 151, 152–53 (Del. 2016). But that comparison confuses secondary liability for aiding and abetting another's wrongdoing with primary liability for one's own wrongdoing. The former always requires *scienter* in the form of knowing participation; there is nothing unique about that standard for financial advisors.

party acquirer is on the outside and expected to bargain in its self-interest. A sell-side advisor is on the inside and expected to help the sell-side fiduciaries fulfill their duties. Directors and officers rely on financial advisors for their advice and expertise.[303]

The sell-side advisor's position on the inside has knock-on effects for the first three *Restatement* factors: (1) the nature of the act encouraged, (2) the amount of assistance given by the defendant, and (3) his presence or absence at the time of the tort. Investment banks play a "central role" in "the evaluation, exploration, selection, and implementation of strategic alternatives."[304]

The financial advisor has significant influence over the sale process and serves as a source of critical information about sale processes in general, specific counterparties, and the financial advisors' interactions. The financial advisor often carries out significant parts of its mandate on its own, then reports back to its principal. An advisor could provide the fiduciary with false or materially misleading

---

[303] *See* 8 *Del. C.* § 141(e); *see also Kahn v. Tremont Corp.*, 694 A.2d 422, 429 (Del. 1997) (recognizing that "in complicated financial transactions such as this, professional advisors have the ability to influence directors who are anxious to make the right decision but who are often *in terra cognito* [sic]"); *RJR Nabisco*, 1989 WL 7036, at *16 ("Sophisticated and effective business generalists of the type likely to be found on the board of such companies as RJR will seldom have the specialized skills useful to most accurately value such securities. Our law, of course, recognizes the appropriateness of directors relying upon the advice of experts when specialized judgment is necessary as part of a business judgment.").

[304] *Inovalon*, 319 A.3d at 292 (internal quotation marks omitted); *accord Brookfield,* 314 A.3d at 1132 (internal quotation marks omitted).

information.[305] An advisor could also withhold information in a manner that misleads the fiduciary on a material point.[306] Or an advisor might take action that undermined the sale process,[307] such as by tipping another party.[308] While acknowledging that breaches of duty in sale processes are likely rare and misconduct by financial advisors

[305] *See Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *28 (Del. Ch. Jan. 25, 1999) (granting summary judgment in favor of defendants charged with aiding and abetting a breach of the duty of care but suggesting that such a claim could proceed if "third-parties, for improper motives of their own, intentionally duped the Live directors into breaching their duty of care"); *see also In re Wayport, Inc. Litig.*, 76 A.3d 296, 322 n.3 (Del. Ch. 2013) (noting that "a non-fiduciary aider and abetter" could be exposed to liability "if, for example, the non-fiduciary misled unwitting directors to achieve a desired result").

[306] *See Macmillan*, 559 A.2d at 1283–84, 1284 & n.33 (describing management's knowing silence about a tip as "a fraud upon the Board"); *Mesirov v. Enbridge Energy Co., Inc.*, 2018 WL 4182204, at *15–16 (Del. Ch. Aug. 29, 2018) (sustaining claim for aiding and abetting against financial advisor for preparing misleading analyses and creating an informational vacuum that misled board); *In re TIBCO Software Inc. S'holders Litig.*, 2015 WL 6155894, at *25–26 (Del. Ch. Oct. 20, 2015) (same); *Rural Metro*, 88 A.3d at 99 (holding that investment banker knowingly participated in board's breach of duty where "RBC *created* the unreasonable process and informational gaps that led to the Board's breach of duty"); *Del Monte Foods*, 25 A.3d at 836–37 (holding that investment bank's knowing silence about its buy-side intentions, its involvement with the successful bidder, and its violation of a no-teaming provision misled the board). *Cf. Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1170 n.25 (Del. 1995) ("[T]he manipulation of the disinterested majority by an interested director vitiates the majority's ability to act as a neutral decision-making body."); *In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 443 (Del. Ch. 2012) ("Worst of all was that the supposedly well-motivated and expert CEO entrusted with all the key price negotiations kept from the Board his interest in pursuing a management buy-out of the Company's E & P business.").

[307] *Morrison v. Berry*, 2020 WL 2843514, at *9 (Del. Ch. June 1, 2020) (citing *RBC Cap. Mkts.*, 129 A.3d at 849–50).

[308] *E.g.*, *Rural Metro*, 88 A.3d at 101–03; *Presidio*, 251 A.3d at 243–46, 268–80.

equally so, the financial advisor's central role makes it all the more conceivable that—when a breach happens—the financial advisor will have assisted in the act and understood its nature.

Of course, like other aiders and abettors, a financial advisor must act knowingly. "To show that a financial advisor acted with *scienter*, a stockholder plaintiff typically points to evidence of a conflict of interest diverting the advisor's loyalties . . . ."[309] Conflicts of interest "can arise from multiple sources, including a long-standing relationship or a compensation arrangement."[310]

The Complaint pleads sufficient facts to state a claim against Goldman for aiding and abetting breaches of duty during the transaction process. This decision has already recognized that the Complaint states a claim against the sell-side fiduciaries for breaching their duties. The Complaint pleads facts sufficient to support an inference that Goldman knew about the breaches and substantially participated in them.

First, Goldman worked with General Atlantic to identify its preferred transaction structure and use that structure as the basis for the bidder outreach. Goldman and General Atlantic inferably designed a narrow process to serve General Atlantic's preferences, despite knowing that more bidders might make a control bid and that a narrow transaction process would constrain the Committee's ability to

---

[309] *Rural Metro*, 88 A.3d at 100.

[310] *Found. Bldg. Materials*, 318 A.3d at 1170.

110

evaluate alternatives and maximize value. Evercore made precisely those points. Goldman and General Atlantic ignored them.

Second, Goldman tipped Vista with price guidance when it told Vista that its bid should be "above $22.00."[311] That was obviously improper.

Third, throughout the sale process, Goldman actively excluded Evercore, even though Evercore was acting as the eyes and ears of the Committee. By doing so, Evercore impaired the Committee's ability to oversee and manage the sale process. Sidelining the Committee helped General Atlantic act more freely, and General Atlantic was Goldman's primary client relationship.

The Complaint pleads facts sufficient to support an inference that Goldman knew that General Atlantic was acting self-interestedly and in breach of its fiduciary duties. Goldman knew that General Atlantic desired liquidity and bargained for unique benefits from the Recapitalization, including the $500 million dividend. Goldman knew that it should not be excluding Evercore and impairing the Committee's ability to monitor the sale process.

Goldman inferably had a motive to pursue the deal that General Atlantic and Vista wanted, even if that transaction was not the best for the Company. Goldman faced conflicts of interest due to its long-standing and ongoing relationships with General Atlantic and Vista.

---

[311] Compl. ¶ 281 (quoting Ex. D at 43; citing GS_00052160).

111

During the transaction process, Goldman was concurrently (i) advising General Atlantic in a take-private transaction, (ii) advising a General Atlantic portfolio company on strategic alternatives, (iii) advising and marketing at least three General Atlantic funds, (iv) maintaining co-investments with General Atlantic in at least six different companies, including at least one co-investment they initiated during the sale process, (v) maintaining a lending relationship with General Atlantic, in which Goldman had extended a €300 million loan, and (vi) maintaining a lending relationship with a General Atlantic fund, in which Goldman had extended a $50 million revolver loan, due September 2025.

During the sale process, Goldman was concurrently (i) advising Vista (including Wilson) on other transactions for two Vista portfolio companies, (ii) maintaining a lending relationship with Vista, in which Goldman had extended an unsecured $1.5 billion loan against Vista portfolio companies, as publicly reported in July 2023, (iii) assisting Vista with a $1 billion cash injection in Finastra in September 2023, and (iv) maintaining a lending relationship with Vista Management Holdings, Inc., in which Goldman had extended a $50 million revolver loan, due March 2027.

Because of those relationships, Goldman had an incentive to reach a transaction that made General Atlantic and Vista happy, even if that transaction was not the best result for the public stockholders. And that is inferably what happened. The Complaint supports a reasonable inference that the Company's minority stockholders could have secured greater consideration if the Company had pursued a

112

wider range of transactions from the start, including control bids, and included parties interested in that type of transaction. The Complaint supports a reasonable inference that if the Recapitalization had not involved holding back money for the General Atlantic dividend, then the minority stockholders would have received more.

Goldman contends that Vista's surprise control bid was an unforeseen event that broke any proximate causation chain linking earlier alleged misconduct to later harm. Hardly. It is reasonably conceivable that Vista's control bid was wholly foreseeable. Evercore anticipated it. Moreover, the shift in transaction structure from a minority sale to a control sale did not wipe the slate clean. By that point, Goldman had worked with General Atlantic to shape the process, sidelined the Committee and Evercore, and tipped Vista.

Goldman also contends that the Complaint cannot support an inference of scienter because the plaintiffs acknowledge that Goldman asked the Committee and its counsel to approve its retention. But disclosing conflicts does not eliminate their effect: "A board's consent to a conflict does not give the advisor a 'free pass' to act in its own self-interest and to the detriment of its client."[312] The fact of Committee approval does not warrant pleading-stage dismissal.

---

[312] *RBC Cap. Mkts.*, 129 A.3d at 855. Indeed, disclosure can turn out to be detrimental, because the disclosing party may feel it has discharged its obligations by making the disclosure, resulting in the disclosing party feeling less constrained in acting self-interestedly. *See* Daniel P. Guernsey, Jr., *Requiring Broker-Dealers to Disclose Conflicts of Interest: A Solution Protecting and Empowering Investors*, 73 U. Mia. L. Rev. 1029, 1056–57 (2019); Robert A. Prentice, *Moral Equilibrium: Stock Brokers and the Limits of Disclosure*, 2011 Wis. L. Rev. 1059, 1099–105 (2011);

The plaintiffs adequately allege that Goldman knowingly participated in breaches of fiduciary duty resulting from General Atlantic's conflicts of interest.

### b.     Aiding And Abetting Disclosure Breaches

The plaintiffs also allege that Goldman aided and abetted the sell-side fiduciaries in failing to disclose material information about Goldman's relationships with General Atlantic, Vista, and Summit. Although there is tension between the Delaware Supreme Court's reasoning in *RBC Capital* and its more recent analysis of conscious inaction in *Mindbody* and *Columbia Pipeline*, the latter decisions instruct courts to follow the *Restatement*'s multifactor approach. Because third-party acquirers and sell-side financial advisors are differently situated and play distinct roles, the outcome is inferably different. The better course at this stage is to defer a decision on this issue under Rule 12(i).

If *RBC Capital* remains good law, then the allegations against Goldman state a claim for aiding and abetting a breach of the duty of disclosure. This decision has found that the Proxy Statement failed to disclose the full extent of Goldman's relationships with General Atlantic, Vista, and Summit. This decision has also found that the Proxy Statement failed to provide an accurate picture of Goldman's role. At the pleading stage, it is inferable that Goldman withheld the pertinent information, putting this case on all fours with *RBC Capital* and stating a claim on which relief

---

Daylian M. Cain, George Loewenstein & Don A. Moore, *The Dirt on Coming Clean: Perverse Effects of Disclosing Conflicts of Interest*, 34 J. Legal Stud. 1, 7 (2005).

114

can be granted. That outcome also comports with *Electric Last Mile*, a post-*Mindbody*, post-*Columbia Pipeline* decision that upheld a claim for aiding and abetting disclosure violations against a financial advisor on similar facts.[313]

Admittedly, the logic of *Mindbody* and *Columbia Pipeline* pulls in the other direction, at least for the *Restatement* element that considers the nature and amount of assistance given by the secondary actor. Under those decisions, Goldman would have to owe a duty to the public stockholders. Although *RBC Capital* supports the existence of such a duty, it does so in passing and only in three words.[314] *RBC Capital* has not been widely read as recognizing a direct duty of disclosure between a financial advisor and public company stockholders, which would provide stockholders with a direct cause of action against advisors. Despite what *RBC Capital* says, reading the decision that way would break new ground.

A more conventional duty would run from Goldman to the Company, either because Goldman was an agent or under the implied covenant of good faith and fair dealing inherent in its engagement letter. Under *RBC Capital*, that duty would require a financial advisor "not to act in a manner that is contrary to the interests of the board of directors, thereby undermining the very advice that it knows the

---

[313] *Elec. Last Mile Sols.*, 2026 WL 207195, at *7–10.

[314] *RBC Cap. Mkts.*, 129 A.3d at 860 ("When parties to a transaction *and their advisors* travel down the road of partial disclosure they have an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events." (cleaned up) (emphasis added)).

115

directors will be relying upon in their decision making processes."[315] Yet assuming that such a duty includes an obligation to provide information about conflicts of interest, that duty would run to the Company, not to the Company's stockholders. Under *Mindbody* and *Columbia Pipeline*, that would not be enough.

Finally, accepting that Goldman owed a duty that ran to the Company and knowingly breached it by failing to provide information, *Mindbody* and *Columbia Pipeline* hold that failing to provide information in the face of a known duty amounts only to passive inaction. It does not amount to the type of active assistance necessary to satisfy the substantial participation requirement.

Under the logic of *Mindbody* and *Columbia Pipeline*, therefore, the claim against Goldman for aiding and abetting might well not involve actionable assistance. After all of the focus on the disclosure of information by financial advisors, and particularly on the importance of conflict disclosure, that would leave the law in an odd place. It therefore seems more likely that while conscious inaction in the face of a duty to act was not enough for the Delaware Supreme Court to find that acquirers had aided and abetted claims for breach of the duty of disclosure, a different calculus could apply to sell-side financial advisors.

Rule 12(i) provides that "[t]he Court may defer until trial ruling on any defense listed in Rule 12(b)—whether made in a pleading or by motion—or any motion under

---

[315] *Id.* at 865 n.191.

116

Rule 12(c)."[316] "A party does not have a right to a pleading-stage ruling at the start of a case."[317] Likewise, Rule 12(b)(6) asks only if a complaint "state[s] a claim upon which relief can be granted."[318] It is not necessary that the court determine at the pleading stage whether every theory states a claim on which relief can be granted.

> There can be significant value in dispensing with meritless claims at the pleading stage. But a court need not examine the sufficiency of every count in a complaint or consider every argument that a defendant has advanced. That is particularly true when an issue will not result in the dismissal of a defendant from the case and where the case involves a common nucleus of operative fact that will be the focus of discovery in any event. In that setting, the case can readily proceed past the pleading stage.[319]

Those principles apply here.

The Complaint states at least one claim for relief against Goldman. The dispute concerns a common nucleus of operative fact, such that ruling on the claim for aiding and abetting a disclosure violation will not alter the scope of discovery. Goldman will face the same litigation burdens in any event and will suffer prejudice from the absence of a pleading-stage assessment. Even if the court dismissed the

---

[316] Ct. Ch. R. 12(i).

[317] *Harris v. Harris*, 289 A.3d 310, 342 (Del. Ch. 2023); *see Spencer v. Malik*, 2021 WL 719862, at *5 (Del. Ch. Feb. 23, 2021). *See also Pattern Energy Gp.*, 2021 WL 1812674, at *46 & n.612.

[318] Ct. Ch. R. 12(b)(6).

[319] *Cygnus Opportunity Fund, LLC v. Wash. Prime Gp., LLC*, 302 A.3d 430, 464 (Del. Ch. 2023).

claim, the dismissal would be interlocutory and could be revisited, subject to the law of the case doctrine, for good cause shown.

In that context, the court need not try to definitively harmonize *RBC Capital* with the more recent approach taken in *Mindbody* and *Columbia Pipeline.* The issue may never need to be addressed, because the parties may settle, discovery may disprove key factual allegations, or other issues may take precedence. The court therefore will defer ruling on the claim for aiding and abetting a breach of the duty of disclosure until later in the case—and potentially after trial. Goldman's motion to dismiss that aspect of the Complaint is denied under Rule 12(i).

### 2. Vista

The plaintiffs also claim that Vista aided and abetted the sell-side fiduciaries in breaching their duties. Vista was in the classic position of a third-party arms'-length buyer, precisely the scenario addressed in the Delaware Supreme Court's recent decisions in *Mindbody* and *Columbia Pipeline.* In *Mindbody*, the justices stated that Delaware's high standard for knowing participation was designed not only to protect a third-party acquirer from liability, but also from the "costs of discovery."[320] That language encourages trial courts to address claims for aiding and abetting against third-party acquirers at the pleading stage.[321]

---

[320] *Mindbody*, 332 A.3d at 392.

[321] *Sjunde AP-Fonden v. Activision Blizzard, Inc.*, 2025 WL 2803254, at *26 (Del. Ch. Oct. 2, 2025).

118

The plaintiffs allege that Vista aided and abetted the sell-side fiduciaries in breaching their duties during the sale process. But the plaintiffs have not pled any action that would go beyond the facts found insufficient in *Mindbody* or *Columbia Pipeline*.

If anything, the Complaint alleges facts that fall short of what the Delaware Supreme Court held to be inadequate in those recent decisions. Vista made an offer as part of a transaction that General Atlantic had made contingent on *MFW* protections. The Complaint does not support an inference that Vista thought its own actions were improper or believed that any of the Company's fiduciaries were violating their duties. The Complaint also does not support an inference that Vista used the post-closing dividend to suborn General Atlantic. To the contrary, the bid process letter asked all potential buyers to address the amount of funds to be used for a distribution of proceeds to General Atlantic.

The Complaint also fails to plead aiding and abetting with respect to disclosure breaches. Nothing distinguishes this case from *Mindbody* itself.[322]

The claims against Vista are dismissed.

### III.    CONCLUSION

The Complaint supports a reasonable inference that the defendants failed to comply with the requirements of *MFW*, resulting in entire fairness serving as the

---

[322] *See Mindbody*, 332 A.3d at 401.

119

operative standard of review. Under this standard of review, the Complaint states a claim on which relief can be granted.

The Complaint supports a reasonable inference that Bennett, Hamilton, and Dunnam could be held liable on non-exculpated claims. The Complaint does not support a reasonable inference that Rodriguez could be held liable on non-exculpated claims.

The Complaint supports a reasonable inference that Goldman aided and abetted breaches of fiduciary duty by the sell-side fiduciaries. The Complaint does not support a similar inference as to Vista.

The motions to dismiss are therefore denied except as to Rodriguez and Vista, whose motions to dismiss are granted.